**In re NICOLE ENERGY SERVICES, INC., Debtor.**

No. 03–67484.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division,
at Columbus.

April 8, 2008.

Marcell Rose Anthony, Columbus, OH, for Freddie L. Fulson, Nicole Gas Production Ltd. and Nicole Energy Marketing, Inc.

***MEMORANDUM OPINION ON TRUSTEE'S MOTION FOR AN ORDER (1) AUTHORIZING AND APPROVING THE SALE OF CERTAIN ASSETS UNDER ASSET PURCHASE AGREEMENT, FREE AND CLEAR OF LIENS, CLAIMS AND INTERESTS, SUBJECT TO HIGHER AND BETTER OFFERS; (2) APPROVING THE PROCEDURES FOR THE SALE OF ASSETS; AND (3) APPROVING THE FORM OF NOTICE THEREOF***

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

### I. Introduction

This contested matter is before the Court on the Motion for an Order (1) Authorizing and Approving the Sale of Certain Assets Under Asset Purchase Agreement, Free and Clear of Liens, Claims and Interests, Subject to Higher

and Better Offers; (2) Approving the Procedures for the Sale of Assets; and (3) Approving the Form of Notice Thereof ("Sale Motion") (Doc. 286) filed by Larry J. McClatchey, Chapter 11 trustee ("McClatchey" or "Trustee"), on October 25, 2006. By the Sale Motion, the Trustee seeks approval of an asset purchase agreement dated October 17, 2006 (as amended, "APA") between the Trustee and Columbia Gas Transmission Corporation ("TCO"). A number of parties ("Objecting Parties") filed objections to the Sale Motion (collectively, "Objections").[1] On December 8, 2006, the Trustee filed his omnibus reply to the Objections (Doc. 304).[2] On April 27, 2007, the Trustee filed a motion to amend the original version of the APA, which was attached to the Sale Motion ("Motion to Amend") (Doc. 356). The assets that are the subject of the Sale Motion consist of litigation claims asserted by Nicole Energy Services, Inc. ("NES," "Nicole" or "Debtor") against TCO in state court.

The Trustee requests approval of the APA on two bases. First, he contends that the sale should be approved under 11 U.S.C. § 363(b) because it is in the best interest of the estate and because TCO made the highest and best offer for the purchase of the pending litigation claims held by NES and others. The Trustee also requests approval of the sale as a compromise under Fed. R. Bankr.P. 9019. In response, the Objecting Parties oppose the Sale Motion and argue that the dollar amount of the settlement and sale significantly undervalues the damages that NES

---

1. The following Objections were filed: (A) Objection of Nicole Energy Marketing, Inc. and Nicole Gas Production, Ltd. to Trustee's Motion for an Order Authorizing and Approving Sale of Assets Under Asset Purchase Agreement ("NEM/NGP Objection") (Doc. 290) filed on November 13, 2006; (B) Nicole Energy Marketing, Inc.'s Objections to Trustee's Motion for an Order (1) Authorizing and Approving the Sale of Certain Assets Under Asset Purchase Agreement, Free and Clear of Liens, Claims and Interests, Subject to Higher and Better Offers; (2) Approving the Procedures for the Sale of Assets; and (3) Approving the Form of the Notice Thereof—Special Additional Appearance of NEM's Counsel in the Remanded State Court Proceedings for Objections ("NEM Special Objection") (Doc. 291) filed on November 13, 2006; (C) Respose [sic] and Objections to Motion for an Order to Sale [sic] Assets to Columbia Gas Transmission Corp., or any Bidder Must be Denied and this Case for the Second Time be Remanded Back to State Court for Jury Trial ("Fulson Objection") (Doc. 293) filed on November 14, 2006 by Freddie L. Fulson ("Fulson"); (D) Objection of Nicole Energy Services Inc. Debtor to Chapter 11 Trustee's Motion for Sale of Assets and Request for Actual Hearing ("NES Objection") (Doc. 296) filed on November 17, 2006; and (E) Special Counsel's Objection to Proposed Asset Purchase Agreement Between Debtor Nicole Energy Services, Inc. and Columbia Gas Transmission Corporation ("Sanders Objection") (Doc. 300) filed on November 22, 2006 by Robert C. Sanders ("Sanders").

2. On December 26, 2006, Creditor, Richard Coleman's, Objections to Trustee's Motion for an Order (1) Authorizing and Approving the Sale of Certain Assets Under Asset Purchase Agreement, Free and Clear of Liens, Claim and Interests, Subject to Higher and Better Offer; (2) Approving the Procedures for the Sale of Assets; and (3) Approving the Form of the Notice Thereof ("Coleman Objection") (Doc. 317) was filed. Contemporaneously, Richard Coleman ("Coleman") filed a motion for leave to file the Coleman Objection out of time ("Motion for Leave") (Doc. 318). The Trustee filed an objection to the Motion for Leave and response to the Coleman Objection (Doc. 324).

On April 12, 2007, the Trustee filed a motion for summary judgment asking the Court to deny the Motion for Leave and to strike, as improperly filed, the Coleman Objection (Doc. 348). Coleman filed his response on April 23, 2007 (Doc. 353). He subsequently withdrew the Motion for Leave and the Coleman Objection on May 7, 2007 (Docs. 362 and 363). The Trustee withdrew the motion for summary judgment on May 8, 2007 (Doc. 364).

allegedly sustained as a result of wrongful actions by TCO.

 Under the law of this Circuit, the Court may approve a sale of all of a debtor's assets under § 363(b) "when a sound business purpose dictates such action." *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir.1986). In making its determination under the *Stephens Industries* analysis, the Court considers the following factors: whether the terms of the proposed sale reflect the highest and best offer for the assets, whether the negotiations were conducted at arm's length, and whether the sale is in the best interest of the estate and its creditors. Applying these factors, for the reasons detailed below, the Court finds that a sound business reason dictates approval of the sale of assets to TCO under the terms and conditions set forth in the APA.

 Because the sale effectuates a settlement of claims held by the estate, the Court also must evaluate the agreement between the Trustee and TCO as a compromise under Fed. R. Bankr.P. 9019. In doing so, the Court must review the agreement under the "fair-and-equitable" standard. *See Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir.1988) (requiring court to apply fair-and-equitable standard to evaluate proposed compromises). The test for determining whether the proposed compromise is fair and equitable requires the Court to evaluate: (1) the Debtor's probability of success if the litigation proceeds; (2) what difficulties may arise in the collection of any judgment; (3) the complexity, expense and delay that the parties will face; and (4) whether the proposed settlement satisfies

the paramount interests of creditors and takes into account their views. *See Fishell v. Soltow (In re Fishell)*, 47 F.3d 1168 (table), 1995 WL 66622 at *3 (6th Cir. 1995). Applying this test, the Court finds that the terms of the proposed settlement are fair and equitable and that each of these elements weighs heavily in favor of approving the compromise. Accordingly, the Court will enter an order granting the Sale Motion.

## II. Jurisdiction

The Court has jurisdiction to hear and determine this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. 28 U.S.C. § 157(b)(2)(N) and (O).

## III. Events Leading up to the Sale Motion

For several years, four affiliated corporations—Columbia Gas of Ohio, Columbia Gas of Kentucky, Columbia Gas of Pennsylvania (collectively, "LDCs")[3] and TCO—were embroiled in litigation with NES in the Court of Common Pleas, Franklin County, Ohio ("State Court").[4] On November 14, 2003 ("Petition Date")— one business day prior to the beginning of a trial in the State Court—the LDCs and TCO (collectively, "Columbia Entities") filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against NES pursuant to 11 U.S.C. § 303(b)(1), which was assigned Case No. 03–67484.[5]

### A. The State Court Litigation

On July 12, 2002, NES filed a certificate of dissolution with the Ohio Secretary of

---

**3.** The LDCs operate as local gas distribution companies.

**4.** The State Court case is captioned *Columbia Gas of Ohio, Inc., et al. v. Nicole Energy Services, Inc., et al.*, Case No. 01CVH065390.

**5.** Although the Court's electronic docket initially erroneously states that this case was commenced with the filing of a voluntary petition, the Court notes that the case began with the filing of the involuntary petition as Doc. 1. The electronic docket was modified on

State and, as of the Petition Date, was in the process of winding up its corporate affairs. Prior to the filing of the certificate of dissolution, NES was a marketer of natural gas, supplying gas for sale to residential and small commercial consumers in Ohio, Kentucky and Pennsylvania. While in business, NES secured supplies of natural gas either from wells owned by an affiliated company or from the commodities market. NES contracted with TCO to transport the gas to the LDCs. In turn, each of the LDCs contracted with NES to deliver the gas to NES's end-user customers in the LDCs' respective states of operation.

Fulson is the principal and sole director of NES, and is also the principal of Nicole Gas Production, Ltd. ("NGP"); Nicole Energy Marketing, Inc. ("NEM"); Nicole Gas Marketing, Inc. ("NGM"); and Nicole Energy Marketing of Illinois, Inc. ("NEMI").[6]

The State Court litigation had been pending between NES and the Columbia Entities for over two years when the Columbia Entities filed the involuntary petition. In the State Court case, the Columbia Entities asserted breach-of-contract claims against NES, seeking to recover damages based on NES's alleged insufficient deliveries of natural gas to the LDCs and alleged failure to pay gas transportation charges to TCO. The Columbia Entities, alleging that a pattern of transfers between Fulson and the various Nicole entities was intended to hinder, delay or defraud creditors, also asserted alter-ego, veil-piercing, successor-liability, fraud and fraudulent-transfer claims against Fulson, NEM, NGP and NGM.

NES, NEM (NES's parent corporation), NGP, NGM and Fulson ("Third–Party Plaintiffs") filed a third-party complaint ("Third–Party Complaint") against TCO in the State Court case. Alleging that TCO failed to properly measure and credit the gas injected into its pipeline system by NGP—NES's production affiliate—NES sought indemnification from TCO for any liability it incurred on the LDCs' breach-of-contract claims. The Third–Party Plaintiffs also sought to recover damages for breach of contract and negligence. According to the Third–Party Complaint, TCO failed to correctly measure and credit the natural gas produced from NGP's metered and unmetered wells. With respect to the metered wells, the Third–Party Plaintiffs claimed that TCO's meters were inaccurate because they were located a considerable distance from NGP's wells and were installed on leaky, ill-maintained gathering lines. The Third–Party Complaint further alleged that TCO breached its contract with NES by failing to install meters on NGP's unmetered wells—a requirement imposed on TCO under its federal natural gas tariff ("Tariff"). The Third–Party Plaintiffs asserted that, rather than installing meters to gauge natural gas production as mandated by the Tariff, TCO instead estimated NGP's production from the unmetered wells using a flawed methodology. The Third–Party Plaintiffs sought to recover between $18 million and $48 million in damages from TCO.

## B. Post–Petition Events in the Bankruptcy Case

On November 17, 2003, NES filed a response and motion to dismiss the invol-

---

April 24, 2004 to reflect the change from an involuntary to a voluntary Chapter 11 pursuant to a Court order. *See infra* Part III.B.

**6.** NEMI filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on February 12, 2002 in the United States Bankruptcy Court for the Northern District of Illinois.

untary petition (Doc. 3) in Case No. 03–67484, and also sought the imposition of sanctions against the Columbia Entities, alleging that the involuntary petition was filed in bad faith. At the same time, NES also moved the Court to remand the State Court case under 28 U.S.C. § 1452, or alternatively, to abstain from exercising jurisdiction under 28 U.S.C. § 1334. Thereafter, three judgment creditors—AGF Direct Gas Sales & Servicing, Inc. ("AGF Direct Gas"); R.E. Uptegraff Manufacturing Co.; and Perry Gas Companies, Inc.—filed motions to intervene, seeking leave to join in the involuntary petition under § 303(c).

While these contested motions were pending, on March 12, 2004, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, which was assigned Case No. 04–53678. On that same date, the Debtor moved for a second time in Case No. 03–67484 to dismiss the involuntary petition (Doc. 62). The Court entered an order consolidating the involuntary and voluntary cases under Case No. 03–67484 and denied the first and second motions to dismiss the involuntary petition as moot (Doc. 66). Immediately following the entry of the consolidation order, the Columbia Entities announced their intention either to seek conversion of the case to one under Chapter 7 or to move for the appointment of a Chapter 11 trustee. The Court deferred a ruling on the motion for remand pending a decision by the Columbia Entities as to which procedural avenue they would take.

On April 26, 2004, the Columbia Entities filed a motion seeking the appointment of a Chapter 11 trustee or, alternatively, conversion of the Debtor's case to one under Chapter 7 of the Bankruptcy Code (Doc. 96). In support of their motion, the Columbia Entities alleged that the management of NES engaged in a pattern of corporate and financial misconduct, including fraudulent conduct, incompetence and mismanagement of the Debtor's affairs. Duquesne Light Company joined in the Columbia Entities' request for the appointment of a Chapter 11 trustee (Doc. 104). On July 22, 2004, NES filed a stipulation consenting to the appointment of a Chapter 11 trustee conditioned upon the Court remanding the underlying litigation back to State Court (Doc. 150). NES subsequently withdrew this stipulation by way of a supplemental stipulation that did not condition the appointment of a trustee on the Court's remand of the State Court case (Doc. 151). On August 20, 2004, the Court entered an agreed order granting the motion to appoint a Chapter 11 trustee (Doc. 155), and on October 8, 2004, McClatchey was appointed as the Chapter 11 trustee (Doc. 162).

On November 11, 2004, McClatchey filed an application with the Court seeking approval to employ Sanders under 11 U.S.C. § 327(e) as special counsel to prosecute the Debtor's claims in the State Court case for the benefit of creditors (Doc. 165). The LDCs responded (Doc. 167) and raised their concerns that the disclosure requirements of Fed. R. Bankr.P.2014(a) were not adequately met. Sanders filed a supplemental verified statement on January 5, 2005 (Doc. 173), and the Court entered an order approving his retention on February 23, 2005 (Doc. 183). The terms of Sanders's engagement were based on a contingency-fee arrangement providing that, among other things, he would receive one-third (or 33 1/3%) of all amounts obtained in settlement, in addition to payment for reimbursement of all out-of-pocket costs and expenses, if the case settled before the first day of trial. If the case proceeded to trial—and either it settled or a judgment was entered in favor of the Debtor—Sanders would receive 40% of any recovery.

On March 1, 2006, the United States Trustee filed a Notice of Appointment of Committee of Unsecured Creditors ("Committee") (Doc. 265). The Committee consisted of representatives from Enron North America Corp. ("Enron"), Michigan Consolidated Gas Company, Washington Gas Energy Services and The Peoples Natural Gas Company, as well as a representative for the Chapter 7 Trustee of AGF Direct Gas.

## C. Status of Partially Remanded State Court Case

On April 5, 2005, the Trustee filed a motion asking this Court to remand to the State Court the claims for breach of contract and negligence asserted by NES and NEM in the Third–Party Complaint (Doc. 191). After considering multiple objections and conducting a hearing on the motion to remand, the Court entered an order remanding the breach-of-contract and negligence claims raised in the Third–Party Complaint ("Remand Order") (Doc. 222). The Remand Order provided for the Debtor's retention of certain claims asserted in the State Court case and the dismissal of other claims. A final pretrial conference was scheduled by the State Court for October 16, 2006, and the trial was set to begin on October 23, 2006. In anticipation of trial—and before the Trustee and TCO negotiated a resolution of the remaining claims that were pending before the State Court—the parties filed numerous motions, including competing motions for summary judgment, motions to exclude expert testimony and other motions in li-

mine. Based on a review of the State Court docket, it appears that these motions, which are described in further detail below, were ripe for decision as of October 13, 2006.[7]

### 1. State Court Breach–of–Contract Claim

After the Remand Order, NES filed a motion for partial summary judgment, reply and post-hearing memorandum on the breach-of-contract claim, arguing that TCO's service agreements and § 26.9(b) of the Tariff required TCO to install meters—at TCO's expense—in order to measure the gas produced by NGP and delivered into TCO's pipeline system. *See* Trustee Exs. 7, 9, 10. TCO asserted, among other things, that the language contained in the service agreement between the parties and the Tariff was ambiguous and in conflict with other provisions of the Tariff. Trustee Ex. 8 at 5–9. TCO argued in the alternative that it met any obligation to install measuring stations and equipment by using a "one-minute-pickup test" to measure gas produced at the unmetered wells. *See id.* at 12–14. The State Court granted summary judgment in favor of NES and held that TCO was required to install meters under the Tariff and that its failure to do so constituted a breach of its contract with NES. *See* Trustee Ex. 11.

### 2. Competing State Court Motions for Summary Judgment on Lost–Profit and Damages Issues

NES filed a second motion for partial summary judgment in State Court, argu-

---

7. The Court takes judicial notice of the contents of the State Court record. *See* Fed. R.Evid. 201(b)(2); *Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir.1983) ("[F]ederal courts may also take notice of proceedings in other courts, both within and outside of the federal judicial system...."); *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir.1980) (taking judicial notice of record in related state proceeding); *Southmark Prime Plus, L.P. v. Falzone*, 776 F.Supp. 888, 892 (D.Del.1991) ("Pursuant to [Federal] Rule [of Evidence] 201(b)(2), the Court can take judicial notice of the contents of court records from another jurisdiction.").

ing that there was no genuine issue of fact as to whether TCO had under-credited NES in the amount of 355,479 decatherms of gas and requesting that the State Court order a release of the gas to the Trustee as a form of damages. Trustee Ex. 12 (Memorandum in Support) at 2. In support of its position, NES relied upon a 1946 report issued by TCO's predecessor, Columbia Gas & Electric Corporation. Based on this report—which, according to NES, reflects when and how an adjustment is appropriately applied to unmetered well production—NES asserted that TCO improperly applied a correction factor when calculating the amount of gas produced by the NGP wells. *Id.* at 4–6, 11–12. Thus, NES argued, had TCO not "erroneously applied its 'correction factors[,]'" NGP would have been credited with producing not less than 355,479 decatherms of gas, an amount significantly higher than the credit of 81,308 decatherms of gas NES received. *Id.* at 11–13. In opposition to NES's motion for summary judgment, TCO maintained that the motion improperly requested specific performance when, in fact, NES had an adequate remedy at law for money damages, Trustee Ex. 13 at 2–6, and that NES had previously produced a report from Daniel Selby ("Selby") reflecting that NES suffered damages for the same quantity of gas in the amount of only $151,677.40. *Id.* at 5–6. TCO also argued that NES misrepresented the 1946 report. *See id.* at 7–8.

TCO also filed two motions for summary judgment in the State Court case. In one motion, TCO argued that NES could not, as a matter of law, support the claim for lost profits or establish a causal connection between the Debtor's financial downfall and the alleged wrongdoing by TCO. Trustee Ex. 25 at 2–3, 14. In its second motion, TCO argued that the base contract between NES and NGP, upon which NES relied to support its claim for damages,

was unenforceable. Trustee Ex. 26 at 1, 4–10.

### 3. Motions to Exclude Expert Testimony

Relying on Ohio Rule of Evidence 702, NES and TCO each filed objections in the State Court case to the admissibility of testimony by the opposing party's gas measurement experts. Each party contended that the other's experts were not qualified to provide expert testimony on gas measurement issues and that the opinions were based on unreliable science. Both parties relied on the principles governing the admissibility of expert testimony enunciated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)—as adopted by Ohio courts—in support of their motions. See Trustee Exs. 23, 24, 27, 38.

### 4. Other Motions in Limine

NES and TCO filed additional pre-trial motions and objections in the State Court case. TCO moved for the admission of all evidence regarding the interactions between the Columbia Entities and the entities controlled by Fulson, as well as any litigation involving the NES-affiliated entities, in order to establish privity between NES and its related entities. Trustee Ex. 32 at 1. TCO moved to exclude the testimony of Selby and Julia Bodamer ("Bodamer") in the event that the testimony of Steve Sly—NES's gas measurement expert—was excluded, and to exclude evidence regarding claims asserted against TCO in a putative class action pending in a West Virginia state court. *Id.* at 3–4. In addition, TCO filed a motion in limine in which it requested the State Court to deem the claims asserted by the Trustee in an adversary proceeding pending before this Court—*McClatchey v. Nicole Energy*

*Marketing, Inc., et al.,* Adv. Pro. No. 05–2602, in which the Trustee seeks substantive consolidation of the Nicole entities ("Substantive Consolidation Action")—as an admission that NES was insolvent in January 1999. Trustee Ex. 33. NES objected to the various motions filed by TCO and also moved to preclude the introduction of any evidence at trial concerning (1) NES's alleged waiver of TCO's obligation to install meters and (2) the alleged agreement to allow TCO to measure gas using the one-minute-pickup test. Trustee Ex. 37.

### IV. The Sale Motion

The Trustee and TCO entered into the APA prior to a scheduled pre-trial conference before the State Court. On October 25, 2006, the Trustee filed the Sale Motion, seeking approval of the APA under § 363 and Fed. R. Bankr.P. 9019.

Under the terms of the Sale Motion, the proposed sale of Assets [8] was subject to higher and better offers and is free and clear of all liens, claims and interests under § 363(f). According to the Trustee, structuring the settlement as a sale subject to bidding procedures was designed to ensure the highest return to creditors and eliminate any arguments that the Assets were undervalued. The Trustee also seeks approval of the settlement with TCO as a compromise under Fed. R. Bankr.P. 9019.

In support of the Sale Motion, the Trustee argues that the sale is in the best interest of the Debtor's estate and "eliminates the substantial litigation risk faced by the estate" if the State Court case were to proceed. Sale Motion at 14. The Trustee further contends that the litigation claims are assets subject to sale under § 363 and that the alleged interests of NEM are subject to a bona-fide dispute.

*Id.* at 15. The Trustee also asserts that he and TCO engaged in extensive arm's-length negotiations resulting in a settlement of NES's claims in the State Court case. *Id.* at 12.

### A. Terms of the APA

Under the terms of the APA, TCO has agreed to purchase from NES and NES has agreed to sell and assign to TCO, all of NES's claims against TCO and the LDCs. Originally the purchase included, but was not limited to, NES's claims in the remanded State Court case and its claims in *Stand Energy Corporation v. Columbia Gas Transmission Corporation,* Kanawha County, West Virginia Circuit Court, Case Nos. 04–C–1976 through 1983 ("Stand Energy Case"), the putative class action referred to above. In the Motion to Amend the APA, the Trustee stated:

> The Amendment is to remove from the Assets to be sold the Debtor's claims against Buyer, if any, in the Stand Energy Case, *without any reduction in the Purchase Price,* and to correct a typographical error. Approval of the Amendment is in the best interest of the estate because it will moot at least one pending objection to approval of the APA and also clarify the APA.

Motion to Amend at 1 (footnote omitted).

The APA as amended—which was subject to higher and better offers—provides for the sale of Assets to TCO on the following terms and conditions:

1. TCO will pay to the Trustee, at closing, the sum of $2.7 million; and

2. TCO shall assume and pay to the Trustee for the benefit of NES's estate certain administrative expenses incurred, and to be incurred, in the bankruptcy case, including:

---

8. Capitalized terms not otherwise defined herein have the meanings set forth in the Sale Motion and the APA, which is attached to the Sale Motion as Exhibit A.

a. All interim and final attorney's compensation and reimbursement of expenses awarded to Kegler Brown Hill & Ritter ("Kegler Brown"), attorneys for the Trustee, for services rendered through the date of the APA;

b. Out-of-pocket costs incurred by the Trustee in the State Court case and remanded case, including reasonable expert-witness fees and expenses and Sanders's out-of-pocket expenses, but excluding the contingent fees due Sanders;

c. All legal fees and litigation expenses incurred by the Trustee and his counsel in prosecuting the Substantive Consolidation Action;

d. All interim and final attorney compensation and reimbursement of expenses awarded to Kegler Brown that are incurred in connection with the APA through bankruptcy court approval and any appeal;

e. All Trustee compensation awarded under 11 U.S.C. § 326, based on the amount distributed by the Trustee to creditors and parties in interest up to the amount of the sale proceeds; and

f. All costs and legal fees incurred by the Trustee in prosecuting involuntary bankruptcy petitions, if any, against NEM and NGP.

Sale Motion at 13. In addition, TCO and the LDCs have agreed to subordinate their claims in the bankruptcy case.[9] These claims are not, however, subordinated to the extent of any recovery by the Trustee in the Substantive Consolidation Action. *Id.*

By way of the Sale Motion, the Trustee also seeks approval of the sale procedures and notice that he provided to all creditors and parties in interest. The Trustee states that he formulated the procedures in order to solicit higher and better offers for the sale of the Assets. The sale procedures contained in the notice of the sale motion ("Sale Notice") that the Trustee served on creditors and parties in interest (Doc. 287) were as follows:

1. Pursuant to the Sale Motion, any party in interest wishing to purchase the Assets was required to submit a Bid Packet (including a Substituted Asset Purchase Agreement and Financial Information Form);

2. The deadline for submitting Bid Packets—to be received by the Trustee and Committee member Albert Edward McMichael, Jr. ("McMichael") at Enron—was November 17, 2006 at 4:00 p.m.;

3. In the event the Trustee received one or more completed Bid Packets, he would conduct an auction ("Auction") for the sale of the Assets on not less than three days' written notice to Qualified Bidders;

4. Qualified Bidders would be permitted to participate at the Auction by telephone or in person; and

5. The Qualified Bidder who submitted the highest offer was required to deliver an Amended Substituted Asset Purchase Agreement reflecting its Winning Bid to the Trustee at

---

9. TCO and the LDCs filed the following claims, which total $3,965,024.74: (1) Claim No. 11 filed by Columbia Gas of Pennsylvania, Inc. in the amount of $1,774,283; (2) Claim No. 12 filed by Columbia Gas of Kentucky, Inc. in the amount of $540,056.82; (3) Claim No. 13 filed by Columbia Gas of Ohio, Inc. in the amount of $970,372.39; and (4) Claim No. 20 filed by TCO in the amount of $680,312.53.

the conclusion of the Auction or within fifteen minutes thereof.

Sale Notice at 1.

The Sale Motion contained additional bidding procedures that were not set forth in the Sale Notice, including the requirements that (1) all bids be for cash-only consideration; (2) bids not be subject to contingencies for due diligence, financing or other approval; (3) all bids be irrevocable until 48 hours after closing of the Auction to TCO or the Winning Bidder under an alternative purchase agreement; (4) all bids be accompanied by a good-faith deposit in the amount of $100,000; and (5) bidding be in monetary increments of at least $100,000 until the close of the Auction. Sale Motion at 19–20.

On November 20, 2006, the Trustee filed the Notice of No Additional Bids for Assets, Selection of Columbia Gas Transmission Corporation as Winning Bidder, and Request for Hearing Confirming Sale ("Winning Bid Notice") (Doc. 298). According to the Winning Bid Notice, the Trustee had not received any additional bids for the Assets by the November 17, 2006, 4:00 p.m. deadline. Thus, the Trustee determined that TCO was the Winning Bidder and purchaser of the Assets under the terms and conditions set forth in the APA.

## B. Objections to the Sale Motion

There were a number of objections to the Sale Motion.[10] A brief summary of each objection follows.

### 1. NEM/NGP Objection

NEM and NGP object to the Sale Motion on multiple grounds. First, they argue that the Trustee may not avoid the requirement of filing a plan and disclosure statement under § 1106(a)(5) by instead filing a motion to sell substantially all of the assets of the bankruptcy estate under § 363. According to NEM and NGP, the sale of assets is therefore not appropriate in this case. They also object on the basis that the Trustee is seeking to compromise NES's claims in the Stand Energy Case without valuing its claims or any possible recovery by the class in which it is a member. The parties' third objection alleges that the Trustee is undermining his position in the State Court case by seeking to compromise the estate's claims at an amount NES's experts assert is significantly undervalued. Finally, NEM and NGP argue that the APA violates prohibitions against the restraint of trade.

### 2. Fulson Objection

Fulson argues generally that the Court should deny the Sale Motion on the basis that the purchase price set forth in the APA undervalues the potential recovery from the State Court claims. He also argues that the Trustee failed to comply with Fed. R. Bankr.P. 9019. Finally, Fulson asserts that, from the perspective of the Debtor and parties in interest, the settlement is not reasonable.

### 3. NES Objection

The Debtor raises a number of arguments in opposition to the Sale Motion. At the outset, NES questions the Trustee's

---

10. Sanders filed an objection to the Sale Motion regarding the calculation of his contingency fee. On December 15, 2006, the Trustee filed an amended application and notice of compromise resolving the Sanders Objection (Doc. 308). The Trustee proposed to pay Sanders $900,000 (representing one-third of the $2.7 million purchase price) and a sum payable from the purchase price equal to one-third of certain expenses TCO agreed to pay on behalf of the estate. The Court entered an agreed order approving the compromise on January 16, 2007 (Doc. 322).

settlement in the amount of $2.7 million in light of the opinion by its experts that the contract and negligence claims exceed $30 million. According to the Debtor, this significantly discounted settlement amount is not in the best interest of parties in interest and is not consistent with the Trustee's fiduciary duties. NES also objects on the basis that the Trustee has failed to adequately and specifically identify the claims that are being settled or the value of such claims. Nor has the Trustee sufficiently disclosed the litigation and other expenses TCO proposes to pay under the APA, the Debtor argues. NES also claims that it is owed $400,000 from the Columbia Entities and that the Trustee failed to disclose the efforts he undertook to recover this amount. Finally, the Debtor opposes the sale procedures proposed by the Trustee.

#### 4. NEM Special Objection

■ NEM—by and through counsel Marcell Rose Anthony—also filed a separate objection. Attorney Anthony failed to appear at the hearing on the Sale Motion to prosecute the NEM Special Objection. Hence, the Court overrules the NEM Special Objection for want of prosecution. *See, e.g., NAACP v. A.A. Arms, Inc.,* 2003 WL 2003797 at *1 (E.D.N.Y. Apr.11, 2003) ("Objections made in papers by [the objecting party] were overruled for failure to prosecute since counsel for [the objector] was not present to argue them."); *In re Charge Trucking, Inc.,* 236 B.R. 620, 622 (Bankr.E.D.Tex.1999) ("To the extent [the objecting party] maintains an objection, it is overruled for its failure to appear and prosecute."); *In re Trans World Airlines, Inc.,* 185 B.R. 302, 311 (Bankr.E.D.Mo. 1995) (overruling objections to confirmation for failure to appear and prosecute); *Lee Servicing Co. v. Wolf (In re Wolf),* 162 B.R. 98, 104 (Bankr.D.N.J.1993) (holding that party in interest waived objection to confirmation by failing to appear at confirmation hearing).

#### C. The Hearing on the Sale Motion

The Court originally scheduled a hearing on the Sale Motion for February 8, 2007. Rather than go forward on that date, the Court converted the proceeding to a pretrial conference and set the matter for hearing to begin on May 21, 2007 ("Hearing"). On February 16, 2007, the Court entered its Order Scheduling Evidentiary Hearing and the Filing and Exchange of Final Witness and Exhibit Lists ("Hearing Order") (Doc. 345).[11]

The Court conducted the Hearing on May 21, 22 and 23, 2007. Testifying in support of the Sale Motion were the Trustee, Attorney James W. Donchess, Attorney James C. Wright and Dr. Richard A. Riley, Jr. Attorney Jerry D. Jordan was called as witness in opposition to the Sale Motion. Sanders provided testimony on behalf of both the Trustee and the Debtor.

A separate transcript of the proceedings for each Hearing date was filed on June 25, 2007 (Docs. 385, 386 and 387).[12] The Court also entered an order on June 26,

---

**11.** Pursuant to the Hearing Order, the parties were required to file with the Court and exchange final witness and exhibit lists "on or before *May 11, 2007.*" Hearing Order ¶ 2. On May 14, 2007, Fulson filed a motion requesting the imposition of sanctions against the Trustee for violating the Hearing Order by providing Fulson with a CD-rom containing the Trustee's exhibits instead of hard copies of the exhibits (Doc. 372). The Trustee responded, stating that he did provide Fulson with printed copies of the exhibits (Doc. 374). The Court entered an order denying Fulson's motion for sanctions on August 7, 2007 (Doc. 404).

**12.** The Court will refer to the Hearing transcripts for May 21, 2007, May 22, 2007 and May 23, 2007 as "Hearing Tr. I"; "Hearing Tr. II" and "Hearing Tr. III," respectively.

2007 (Doc. 388) establishing August 31, 2007 as the deadline for submitting proposed findings of fact and conclusions of law. NES, the Trustee and Fulson each filed proposed findings of fact and conclusions of law on August 31, 2007 (Docs. 413, 414 and 416, respectively).[13]

### D. The Sale Hearing—Preliminary Matters

#### 1. Motion to Strike McClatchey's Testimony

In his role as the Chapter 11 trustee, McClatchey provided testimony beginning on the first day of the Hearing. He also made an opening statement in support of the Sale Motion and examined—on direct and cross examination—other witnesses during the course of the Hearing. Stewart H. Cupps, an attorney with Kegler Brown, conducted the direct examination of the Trustee. Attorney Grady L. Pettigrew, on behalf of NES, and Attorney Michael T. Gunner, on behalf of NGP, cross-examined the Trustee.

Before the presentation of evidence began on the second day of the Hearing, counsel for NGP moved to "strike the testimony [that] Larry McClatchey, Trustee has provided in this case or to disqualify the firm of Kegler, Brown from further representation of the Trustee in this case." Hearing Tr. II 232:21–24. Counsel for NGP argued that the Trustee's testimony was improper based on Disciplinary Rule 5–102 and Ethical Considerations contained in the Ohio Code of Professional Responsibility, which, according to NGP, "militate against continued representation

---

**13.** The Court notes that NES submitted proposed findings of fact and conclusions of law ("NES Findings/Conclusions"), as did Fulson ("Fulson Findings/Conclusions"). These submissions contain very few citations to the record and, frequently, are unintelligible. Because Fulson is appearing pro se (although the Fulson Findings/Conclusions seem to be identical to those proposed by NES), he has been accorded considerable leeway. But the Court found the NES Findings/Conclusions, which were prepared by counsel, to be of little or no assistance because they are replete with errors in punctuation and grammar, contain few citations to the record and make numerous misstatements of law. The following are but a few examples: (1) NES states that "[t]he trustee did not file a Chapter 11 reorganization plan., as required by FRBP 9019." NES Findings/Conclusions at 3, ¶ 11 (The Court notes that Fed. R. Bankr.P. 9019 governs the approval of compromises, not the filing of a plan.); (2) "The Federal. Rule of Civil Procedure 9(b), made applicable to bankruptcy cases by Federal Rule of Bankruptcy Procedure 7009, has been violated by the trustee because he committed perjury when he stated in this Court that he was not after Freddie L. Fulson's personal assets despite the fact that he included Freddie L. Fulson in his personal capacity in the adversarial consolidation complaint[.]" NES Find-

ings/Conclusions at 3, ¶ 14 (Rule 9(b), governing the pleading of fraud, is inapplicable here.); (3) "There was no Creditors Committee established, as required, according to Chapter 11 Rules." NES Findings/Conclusions at 3, ¶ 16 (As discussed *supra* at Part III.B., a committee was appointed in this case by the United States Trustee. There are no "Chapter 11 Rules," but rather the Federal Rules of Bankruptcy Procedure. Nor is it clear to which rule counsel is referring.); (4) "The Federal Bankruptcy Rule § 1121 requires the plan be devised...." NES Findings/Conclusions at 5, ¶ 2 (There is no "Federal Bankruptcy Rule § 1121." Rather § 1121 is a provision contained in the Bankruptcy Code.); and (5) "Rule of Bankruptcy Procedure 7009 provides: Fraud, Mistake, and Condition of the Mind. The trustee has filed *an* substantive consolidation complaint that contains fraudulent and *mistaken* allegations." NES Findings/Conclusions at 6, ¶ 5 (emphasis added) (Rule 9(b), made applicable by Fed. R. Bankr.P. 7009, actually states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R.Civ.P. 9(b). Thus, it is unclear what counsel is referring to in this proposed conclusion of law.).

when in this case the lawyer is both counsel and a witness." *Id.* at 234:2–4. The Court advised counsel that the Ohio Rules of Professional Conduct supplanted the former Disciplinary Rules, effective February 1, 2007, and, thus, the provisions cited by NGP were not applicable. The Court afforded NGP the opportunity to renew the objection based on citation to the appropriate rules. *Id.* at 236:20–237:15.

On day three of the Hearing, NGP renewed its motion to strike the testimony of the Trustee and also to strike certain provisions contained in the APA that require TCO to pay the Trustee's fees and expenses to pursue both the Substantive Consolidation Action and possible involuntary cases against the NES-related entities. In support of its motion, NGP relied on Ohio Rules of Professional Conduct 1.8, 3.7 and 5.4. *See* Hearing Tr. III 6:15–13:19. The Trustee responded by asserting that his testimony—as trustee—was not improper and that to disqualify either himself as trustee or his law firm would not only be "highly prejudicial," but would

also impose a substantial hardship on the estate. *Id.* at 13:24–15:14. As to the alleged impropriety of the fee provision in the APA, the Trustee argued that the Court "cannot redact anything from the agreement, it will either be approved as it was executed or not." *Id.* at 15:15–18. In addition, the Trustee explained that there are safeguards in place under the APA to protect the estate from any potential impropriety arising from the fee provision.[14]

The Court rejected the motion to strike the fee provisions in the APA—or alternatively, the agreement in its entirety—and held that NGP's argument was without merit. *Id.* at 25:7–9. The Court reviewed Rule 1.8(f), which prohibits attorneys from accepting compensation under certain circumstances.[15] The Court concluded that under the first prong of Rule 1.8(f), the client—here the Trustee—gave his informed consent to the compensation arrangement. *Id.* at 22:23–23:2. As to the second prong of Rule 1.8(f)(2)—that the arrangement does not interfere with the "lawyer's independence of professional

---

14. The following provisions were highlighted by the Trustee: (1) "Section 2.2 of the [APA] which deals with the assumption of priority and litigation expenses not only provides that this Court will have to approve any compensation, reimbursement [of] expenses that's allowed, but it also expressly reserves to Columbia the right to object to any fee applications that are filed with the Court." *Id.* at 15:21–16:2; (2) "[O]n the issue of the Trustee's independent judgment, Section 3.02 of the [APA] is a carefully worded paragraph. . . . The first sentence obligates the Trustee to continue prosecution of the substantive consolidation case *subject to the Trustee's determination that the continued prosecution of it is in the best interest of the estate and its creditors.*" *Id.* at 16:8–15 (emphasis added); and (3) "[T]here is a following provision which essentially says that if Columbia wants to cease funding that litigation or comes to the conclusion that it's not in the best interest of the estate or chooses not to proceed with those funding responsibilities, if the Trustee wants

to proceed the Trustee can still do that." *Id.* at 16:15–20.

15. Rule 1.8(f) provides as follows:
A lawyer shall not accept compensation for representing a client from someone other than the client unless divisions (f)(1) to (3) and, if applicable, division (f)(4) apply:
(1) the client gives *informed consent;*
(2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship;
(3) information relating to representation of a client is protected as required by Rule 1.6;
(4) if the lawyer is compensated by an insurer to represent an insured, the lawyer delivers a copy of the following Statement of Insured Client's Rights to the client in person at the first meeting or by mail within ten days after the lawyer receives notice of retention by the insurer. . . .
Ohio Rule of Professional Conduct 1.8(f)(1)-(4).

judgment or with the client-lawyer relationship"—the Court found that § 3.02 of the APA and "the over-arching requirement that any professional service rendered in any bankruptcy case before this Court to be eligible for compensation must [be shown to have] provide[d] a benefit to the estate" does, in fact, "preserve[ ] the Trustee's professional independence in this case...." *Id.* at 23:15–20. Finally, the Court determined that the third prong of Rule 1.8(f) does not "come[ ] into the equation[,]" *id.* at 25:5, because "the Trustee is the client and the Trustee holds the privilege. So to the extent that the Trustee decides to share information with a third party, whether it's TCO or some other party, that's his decision." *Id.* at 25:1–4.

The Court also held that NGP's argument based on Rule 3.7 to strike the testimony of the Trustee or to disqualify his law firm, "likewise, has no merit under the circumstances of this case." *Id.* at 25:14–17. Rule 3.7(a) provides as follows:

(a) A lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness unless one or more of the following applies:

(1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case;

(3) the disqualification of the lawyer would work *substantial* hardship on the client.

Ohio Rule of Professional Conduct 3.7(a). The Court overruled NGP's motion and held that Rule 3.7(a) did not apply because "[i]n this situation, Mr. McClatchey is really appearing in a dual capacity. When he testified in terms of the thought process and the analysis he went through to decide whether or not to enter into th[e] [APA], he was testifying in his capacity as Trustee. He did not testify in his capacity as attorney for the Trustee." *Id.* at 25:23–26:4.[16]

■ Although McClatchey testified in his role as the Trustee, rather than attorney for the Trustee, NGP's motion would have no merit even if McClatchey had testified in his capacity as attorney for the Trustee. The "advocate-witness rule" on which NGP relies applies only when an attorney is representing a client other than himself, not when the attorney—as the Trustee did here—testifies and represents himself in the same proceeding. *See Horen v. City of Toledo Pub. Sch. Dist. Bd. of Educ.*, 174 Ohio App.3d 317, 882 N.E.2d 14, 20 (2007) ("There are several federal courts that have addressed the issue and held that an attorney may always represent himself in his own litigation even if he must testify as to the substantive facts of the case. Most recently, in *Cooke v. AT & T Corp.*, No. 2:05–CV–374, 2006 WL 1447415, at *3 (S.D.Ohio 2006), the court held that there was no basis under DR 5–102(A) for removal of an attorney from representing himself or his wife because the attorney had an unqualified right to

**16.** The Court also agreed with the Trustee's contention that NGP's arguments were untimely, particularly when the Trustee's name was listed on the Trustee's Preliminary Proposed Witness and Exhibit List for Contested Sale Hearing (Doc. 340) filed on February 6, 2007, *id.* at 26:9–11, noting that "when Mr. McClatchey made the opening statement in this proceeding ... it was apparent that he was going to also be participating as an attorney." *Id.* at 26:11–14. The Court, however,

recognized that the rules with respect to whether an attorney may testify on behalf of a client are not waivable and, in support of that conclusion, referred the parties to *Dynasty Apparel Indus., Inc. v. Rentz*, 206 F.R.D. 596, 600 (S.D.Ohio 2001) ("Courts have held that the witness/advocate rule embodied in [former] DR 5–101(B) is mandatory and cannot be waived, because it is intended, in part, to protect the institutional concerns of the bar and the legal system.").

represent himself in civil litigation in a federal court, his testimony is cumulative, he is already subject to cross-examination regarding his own case, and the jury would be able to understand that the attorney has a personal interest in the outcome of the two claims and it could evaluate the credibility of the attorney's testimony on that basis.").

## 2. Motions in Limine

On May 18, 2007—one business day before the Hearing was scheduled to commence—the Trustee filed the following motions: (1) Trustee's Motion in Limine to Exclude Objecting Debtor's Exhibits ("Motion to Exclude Exhibits") (Doc. 376); and (2) Trustee's Motion in Limine to Exclude and Disqualify Richard Coleman as Witness ("Motion to Disqualify Coleman") (Doc. 378).

### a. Motion to Exclude Exhibits

The Trustee moved to exclude NES's Exhibit X, a November 6, 2006 letter from Attorney Mark C. Ellenberg of Cadwalader, Wickersham & Taft LLP ("Cadwalader Letter"), on the basis that the letter constituted impermissible hearsay as to the lack of involvement by the Committee in the settlement between the estate and TCO. The Trustee also moved to exclude NES's Exhibit Z—a composite exhibit consisting of various pleadings filed in the Stand Energy Case—on the basis that these documents were irrelevant under Fed.R.Evid. 402 because the APA, as amended, did not include the sale of any claims asserted in the Stand Energy Case. Finally, the Trustee moved to exclude

NES's Exhibits Y, EE and FF, which addressed issues concerning Pennsylvania Land Holdings, Inc. ("PLHC") (discussed *infra* at Part VI.B. 1.a.ii.), to the extent that these documents constituted hearsay and were more prejudicial than probative under Fed.R.Evid. 403. In addition, the Trustee advised the Court that the PLHC documents were subject to a confidentiality agreement that permitted only limited use in the State Court case.

At the beginning of the Hearing, the Court granted the motion to exclude the Cadwalader Letter. Hearing Tr. I 19:13–14.[17] NES withdrew Exhibit Y, Hearing Tr. III 98:16, and tendered Exhibits DD and EE by proffer. *Id.* at 103:6–12. The Court also granted the motion to exclude Exhibit Z "since the Stand Energy claim [was] carved out of the [APA]." *Id.* at 99:9–11.

### b. Motion to Disqualify Coleman

In the Motion to Disqualify Coleman, the Trustee argued that Coleman's testimony would be improper because he claims a 10% contingency fee interest in the net proceeds recovered in the State Court case. The Trustee relied on Ohio Rule of Professional Conduct 3.4 in seeking the disqualification of Coleman as a witness and the exclusion of his testimony based on his financial stake in the outcome of the litigation.[18] The Court excluded the testimony of Coleman. Hearing Tr. I 19:12–13. NES proffered the testimony of Coleman, as well as Exhibits DD (an affidavit by Coleman) and EE (a gas measurement analysis by Coleman) at the con-

---

17. At the close of the evidence, NES withdrew Exhibit X. Hearing Tr. III 98:16.

18. Comment 1 to Rule 3.4 states that "[t]he procedure of the adversary system contemplates that the evidence in a case is to be marshaled competitively by the contending parties. Fair competition in the adversary system is secured *by prohibitions against* destruction or concealment of evidence, *improperly influencing witnesses*, obstructive tactics in discovery procedure, and the like." (emphasis added).

clusion of the Hearing and outside the presence of the Court. Hearing Tr. III 102:22–104:24.

Although he later withdrew the objection, *see supra* n. 2, Coleman objected to the Sale Motion of the basis that the sale of the Debtor's assets for $2.7 million in lieu of the $36 million sought in the State Court would not benefit the Debtor or its creditors. *See* Coleman Objection at 3–5. Coleman also sought approval of certain fees that he described as "reasonable expert witness fees." *Id.* at 3. Coleman stated that he had "entered into a written agreement with Freddie L. Fulson, President of NES[ ]" and that the "contingency fee agreement with NES provides that Mr. Coleman shall receive ten percent (10%) of the damages recovered by NES and NGP." *Id.* at 2. Coleman described his work for NES as conducting natural-gas measurements, studying gas-production problems and performing tests on metered and unmetered wells. He also alleged that "[t]he information, documentation and calculations provided by Mr. Coleman were used by other experts that were hired by NES...." *Id.* at 3. Despite his self-characterization as an expert witness, Coleman was designated by NES as a fact witness.

During the Hearing, counsel for NES stated that "submitting Mr. Coleman is for the purpose of, from the debtor's standpoint, helping the Court to see the horizon of both facts as well as issues that were present at the time the case was purportedly settled...." Hearing Tr. I 11:4–7. Counsel for the Trustee reiterated that the request to exclude Coleman's testimony was based on his 10% contingent-fee interest. In response, counsel for NES described the contingent interest as "probably the most vulnerable aspect that we have of this.... [T]here is the existence of that letter and that proposed compensation based on the letter. So I don't have any-

thing to counter the Trustee's comments with regard to that." *Id.* at 11:21–12:2.

■ Coleman's interest in the outcome of the State Court case raised several concerns regarding his credibility and the weight, if any, the Court should give his testimony. *See Florida Capital Corp. v. Caddell,* 1971 WL 257 at *1 (S.D.N.Y. 1971) ("One of the great problems in reaching a decision ... stems from the fact that practically all of the witnesses tendered by the parties have a financial stake in the outcome of the litigation or have had close personal, favorable or unfavorable, relationships with the parties, and, therefore, ascertaining the truth through the blurs created by prejudice, bias or interest is a difficult matter."). When the trier of fact is a jury, the financial interest of a witness generally will go to the credibility and weight of the testimony, not to its exclusion. *See In re Dow Corning Corp.,* 255 B.R. 445, 527–28 (E.D.Mich. 2000). When the trier of fact is the court, however, it is within the court's discretion to assign no credibility and weight to the testimony of a witness who has a financial interest in the proceeding and to exclude the testimony on that basis. *See id.* In connection with the *Dow Corning* confirmation hearing, for example, the bankruptcy court excluded the testimony of attorneys for certain foreign claimants on the issue of whether the Chapter 11 plan was fair to the foreign claimants. On appeal, the foreign claimants argued that the exclusion was inappropriate because the bankruptcy court had allowed the testimony of attorneys for other claimants. In holding that the bankruptcy court had not abused its discretion, the district court found that the bankruptcy court excluded the testimony of the witnesses for the foreign claimants not only because the witnesses were attorneys for the claimants but also because they had a "financial in-

terest in the outcome of the confirmation hearing." *Id.* at 527. In light of the concerns raised regarding Coleman's financial interest and the Debtor's failure to adequately address those concerns, the Court, as trier of fact, determined that it would find Coleman's testimony entirely unreliable. For these reasons, the Court concluded that his testimony should be excluded.

■■■ The Court's decision to exclude Coleman's testimony also was based upon Fed.R.Evid. 403, which provides as follows: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, *or needless presentation of cumulative evidence.*" Fed.R.Evid. 403 (emphasis added). The trial court has "broad authority over the management of trials. Part of this authority is the power to exclude cumulative testimony." *Tran v. Toyota Motor Corp.,* 420 F.3d 1310, 1315 (11th Cir.2005) (citation omitted) (affirming district court's order excluding testimony as cumulative); *see also Bowman v. Corr. Corp. of America,* 350 F.3d 537, 547 (6th Cir.2003) (affirming district court's exclusion of testimony as cumulative where party offering testimony had "not demonstrated how the exclusion of [the] testimony resulted in substantial injustice" to her); *Schneck v. Int'l Bus. Corp.,* 1996 WL 885789 at *24 (D.N.J. June 25, 1996) ("Where documentary or testimonial evidence is merely cumulative, it serves no purpose and, therefore, should be excluded.").

Applying Rule 403, courts have excluded testimony that would have been cumulative of documentary evidence. *See, e.g., Dailey v. Vought Aircraft Indus., Inc.,* 2004 WL 1068101 at *3 (N.D.Tex. May 10, 2004) ("The testimony of the EEOC investigator may be excluded as cumulative and preju-

dicial if the Court has admitted the investigative report and findings."); *Siegrist v. Kleinpeter,* 2004 WL 797723 at *4 (E.D.La. Apr.13, 2004) ("[T]he Fund can admit the Medical Review Panel's report without the testimony of a panel member. See Fed. R.Evid. 803(8). Accordingly, any testimony by one of the review panel members would be strictly cumulative, and the Court excludes such testimony."); *Schneck,* 1996 WL 885789 at *25 ("This Court finds that Dr. Glucksberg's opinions add nothing to plaintiffs' case beyond that which has already been proffered in the report of Dr. Punnett. Such repetition serves no useful purpose and is merely cumulative. Accordingly, Dr. Glucksberg's opinions shall be excluded from evidence *in limine.*").

The matters to which Coleman would have testified were incorporated into the Report of Economic Damages, discussed *infra* at Part V.B. Because that report was itself to be admitted into evidence, the Court concluded that Coleman's testimony would constitute needless presentation of cumulative evidence. In fact, Sanders's testimony supports the Court's finding that Coleman's testimony would have been cumulative. *See* Hearing Tr. II 28 8:9–16 ("I viewed him as a consultant, not an expert.... So Mr. Coleman, his role as a witness is really not that important any more because ... he's what I guess the federal rules refer to as a summary witness."); *id.* at 289:2–12 ("He understands production and he's performed fact analysis of the production issues in this case. He's provided that to our damage experts. They say in their report that they have independently reviewed and verified what he did and they have endorsed it and essentially owned it as their own.... I don't believe [Coleman's testimony is] necessary."). The Court's exclusion of Cole-

man's testimony was therefore proper under Rule 403.[19]

## V. Evidentiary Record

### A. Exhibits

At the conclusion of each party's presentation of evidence, the Court admitted the following exhibits without objection: (1) Trustee's Exhibits 1 through 60 and 72 through 76; and (2) Objecting Debtor's Exhibits A through F, H through V, and GG and HH.

### B. Report of Economic Damages

The central piece of documentary evidence presented to the Court was the Report of Economic Damages ("Damages Report"), which is dated March 31, 2006 and was prepared by Selby and Bodamer at the request of NES. Trustee Ex. 50. In support of the Damages Report, Selby and Bodamer contend that TCO failed to properly measure and credit the production of gas from the unmetered wells in the amount of 355,479 decatherms and from the metered wells in the amount of 141,165 decatherms, for a total under-credit of 496,644 decatherms of gas.[20] *Id.* at 5. The alleged under-crediting occurred from De-

cember 1, 1999 through August 31, 2002. *Id.* at 2. But for the under-crediting, Selby and Bodamer concluded that "NES would have had net profits of $32,463,996.44 over the five-year period encompassing calendar years 2001 through 2005...." [21] *Id.* According to Selby and Bodamer, after accounting for certain debts and offsets, the net damages caused by the under-crediting totaled $31,989,453.47.[22] *Id.* In addition to the damages resulting from the alleged under-crediting, Selby and Bodamer also "determined that NES incurred $4,994,194.07 plus interest in debt as a result of TCO's failure to timely and correctly measure and credit NES's gas...." [23] *Id.*

Selby and Bodamer classify the damages into five components: (1) damages of $6,510,992.67 resulting from the loss of a fixed-price supply from NGP over a five-year period, *id.* at 11; (2) damages of $3,184,155.77 resulting from the loss of existing business, *id.* at 15; (3) damages of $6,811,250 for the loss of new minority programs and user customers, *id.* at 18–19; (4) damages of $42,181,800 resulting from the loss of new private-sector and end-user customers, *id.* at 21; and (5) damages of

19. On June 19, 2007, Fulson filed a motion for reconsideration of the Court's exclusion of Coleman's testimony ("Reconsideration Motion") (Doc. 383). In the Reconsideration Motion, Fulson stated that Coleman's testimony "would bring to light facts to the Nicole state court litigation and the adversary consolidation complaint of the trustee." Reconsideration Motion at 2. The Court has addressed its concerns regarding Coleman's testimony as it related to the State Court litigation. The Court notes that the "adversary consolidation complaint"—which presumably refers to the Substantive Consolidation Action—was not before the Court at the Hearing. The Court entered an order denying the Reconsideration Motion on August 7, 2007 (Doc. 404).

20. According to the Damages Report, there were 138 natural gas wells in total that were

owned by NGP—70 wells were unmetered and 68 were metered wells. *Id.* at 3.

21. The Court will refer to the five-year period of time from 2001 to 2005 during which NES allegedly incurred the damages as the "Damages Period."

22. The Damages Report "computes the net profits before taxes by means of a cash flow calculation that recognizes revenues, variable costs and fixed costs [and] ... reduces the net profit of $32,463,996.44 to account for certain debts and offsets." *Id.*

23. This amount was adjusted downward by $329,341.60 to account for debt NES incurred that was not attributed to TCO's alleged under-crediting. *Id.*

$4,994,194.07 for debt incurred as a result of TCO's failure to properly credit NES's gas. *Id.* at 26. The damages total $63,682,392.51. Selby and Bodamer account for cumulative expenses during the Damages Period totaling $26,224,202. *Id.* at 23. In addition, they deduct various offsets in the amount of $474,542.97 and an adjustment for NES debt (not attributable to TCO's alleged breach of contract) in the amount of $329,341.60. *Id.* at 2. NES alleges that it sustained damages in the net amount of $36,654,305.94. *Id.* at 27.

## 1. Loss of Fixed–Price Supply

The damages for loss of a fixed-price supply ostensibly arise from a five-year contract between NES and NGP under which NES agreed to purchase all gas produced from NGP's wells. In calculating these damages, Selby and Bodamer assumed a contract price of $2.85 per decatherm for the Damages Period. *Id.* at 10–11. When determining actual production volumes, they "credited the unmetered wells 100% of the volumes as determined by monthly pick-up testing (without 'correction factor') and 137% of the metered production to account for 'line loss.'" *Id.* at 10.

Selby and Bodamer assumed that, during the Damages Period, NES would have "expand[ed] its supply portfolio to include additional supplier relationships under lock box/direct pay arrangements." *Id.* at 11. In addition, "[t]o provide the necessary level of comfort required by suppliers, NES planned to purchase Receivable Insurance...." *Id.* Finally, Selby and Bodamer opined that "[o]ver time, NES would have sufficient capital to engage in conventional sales arrangements...." *Id.* at 12.

## 2. Loss of Existing Business

To determine the damages arising from NES's alleged loss of existing business,

Selby and Bodamer reviewed various end-user contract prices, contract terms, volumes of consumption, and costs for transportation and supply. The majority of end-user contracts became effective in April, May, June and September 2000, and extended into 2001. *Id.* at 12. The Damages Report "assumed high levels of NES customer migration—10% per year beginning with the year 2000, yielding a 60% loss of customers by the year 2005." *Id.* at 15. Despite this high customer-attrition rate, Selby and Bodamer concluded that "TCO's undercrediting of NES's gas caused NES lost earnings of $3,184,155.77 from its existing book of business...." *Id.*

## 3. Loss of New Minority Programs and End–Users

The Damages Report reflects damages that NES allegedly incurred as a result of new minority business that NES lost from two types of programs: (1) state minority set-aside programs; and (2) private sector minority set-aside programs. Selby and Bodamer made a number of assumptions in calculating this category of damages. For example, they noted that NES "expected to target all areas[ ]" within a geographic footprint from Maine to Florida. *Id.* at 15. They opined that "[i]f NES proceeded to obtain approval to participate in state minority programs in all states within its geographical footprint, as expected, NES could easily have built a daily load that averaged 80,000 de[c]atherms per day within a 3 year period." *Id.* at 17. The Damages Report noted that NES also planned to offer a five-cent per decatherm gross margin to all state-owned facilities. *Id.* Based on these assumptions, Selby and Bodamer concluded that, during the Damages Period, "TCO's undercrediting of NES's gas caused NES lost earnings of $4,359,000.00 from state government end-

users participating in minority set aside programs...." *Id.* at 18.

According to Selby and Bodamer, NES also "stood an excellent chance of securing at least 15%" of energy loads under private sector set-aside programs. *Id.* To this end, NES had conducted initial telemarketing inquiries to identify large corporations with minority programs. *Id.* "NES planned to offer all corporate minority gained facilities a price with a 5 cent per de[c]atherm gross margin regardless of size." *Id.* at 19. Thus, according to the Damages Report, "TCO's undercrediting of NES's gas caused NES lost earnings of $2,452,250.00 from private sector corporations participating in minority set aside programs...." *Id.*

### 4. Loss of New Private–Sector Customers

The most significant portion of the gross damage claim—an amount exceeding $42 million—is based on Selby's and Bodamer's estimate of the loss of new residential and small private-sector customers during the Damages Period. *Id.* at 21. NES planned to obtain residential customers through "Customer Choice" programs "and planned to participate in all residential programs within its geographical footprint." *Id.* at 20. The "Customer Choice" market includes residential properties, apartments, churches, police departments, restaurants and other similarly situated facilities. The programs allow customers to select gas marketers. In 2000, NES had customers in Ohio, Kentucky and Michigan that were obtained through choice programs. *Id.* at 19. During that same year, "the gross margin was approximately $2 per de[c]atherm averaged over the twelve month cycle." *Id.* at 20.

NES also planned to market gas to small businesses—those customers "that were too large to participate in residential programs but had small load profiles ... within a range of 1,000 to 5,000 de[c]atherms per month." *Id.* As reflected in the Damages Report, NES "planned to heavily concentrate its future marketing efforts in this segment." *Id.* To obtain small-business customers, NES planned to "handle all purchasing, nominating, balancing, billings and collection matters[ ]" for these customers. *Id.* at 21. NES intended to accept a smaller gross margin with these customers, but planned to have a higher number of customers. *Id.*

### 5. Damages for Debt Incurred by NES

The final category of damages arises from debt that NES believes it incurred as a result of TCO's alleged failure to properly credit gas to NES. Selby and Bodamer recognized that at least $2,911,000 of this debt was not incurred by NES as a result of TCO's alleged under-crediting. If TCO had credited NES in December 2000 or January 2001 at the levels NES believed proper, however, NES would have been able to sell approximately 261,114 decatherms of gas resulting in "revenues to NES of $2,415,304.50 to $2,749,530.40. These revenues would have allowed NES to service all of its then existing debt." *Id.* at 25.

### 6. Anticipated Expenses

The Damages Report also takes into account expenses NES would have incurred for staffing, computer systems and other infrastructure needed to support its anticipated future business. *Id.* at 21–22. In addition, Selby and Bodamer assumed that NES would have purchased receivables insurance at a cost of "approximately one half of a cent per unit of gas." *Id.* at 22. According to Selby and Bodamer, NES did not have a complex and expensive marketing plan, but instead produced

materials in-house. Although the Damages Report assumed the need for NES to outsource some telemarketing, the majority of those efforts would have been conducted in-house by NES staff. The Damages Report reflects cumulative expenses during the Damages Period in the amount of $26,224,202. *Id.* at 23.

## C. Decision on Motion for Partial Summary Judgment in the State Court Case

Another critical document relied upon by the parties is the Amended Decision and Entry Granting Third–Party Plaintiff Nicole Energy Services, Inc.'s August 10, 2005 Motion for Partial Summary Judgment as to Liability on Count III (Breach of Contract) of the Third–Party Complaint ("State Court Decision") dated January 24, 2006. Trustee Ex. 11. NES had alleged that, as a matter of law, TCO breached the parties' service agreement when it failed to install meters on 70 unmetered wells owned by NGP. State Court Decision at 4. The State Court was required to decide whether § 26.9(b) of the Tariff—as incorporated into an Interruptible Gathering Service Agreement, effective December 1, 1999, and a Firm Transportation Service Agreement, effective October 1, 2000, between NES and TCO—required the installation of meters by TCO. The pertinent language of § 26.9(b), as restated in the State Court Decision, provides that " '[u]nless otherwise agreed to in writing ... Transporter [TCO] will install, operate and maintain measuring stations and equipment by which the volumes of natural gas or quantities of energy received by Transporter are determined.' " *Id.* at 5 (quoting Tariff § 26.9(b)).

Relying upon West Virginia contract law, the State Court granted summary judgment in favor of NES on the breach-of-contract issue. Specifically, the State Court found that "the language of Section 26.9(b) [was] not ambiguous on its face nor [was] it susceptible to more than one meaning after applying the established rules of construction. Section 26.9(b) obligates TCO to 'install, operate and maintain measuring stations and equipment' so as to measure the gas it receives into its pipeline." [24] *Id.* at 11. After determining that the language in § 26.9 was not ambiguous, the State Court also found that TCO was required "to determine the gas volumes, not merely approximate them." *Id.* at 16. Because TCO had failed to present any evidence that it "actually installed, operated and maintained measuring stations and equipment" or that "in order to conduct the one-minute pick-up test it was required to install, operate and maintain any measuring stations and equipment at those meters," the State Court concluded that TCO did not demonstrate the existence of a genuine issue of material fact as to whether it complied with § 26.9(b). *Id.* at 17.

## VI. Legal Analysis

By way of the Sale Motion, the Trustee asks the Court to approve the sale of the claims owned by the NES estate under § 363 or as a compromise under Fed. R. Bankr.P. 9019. Under these circumstances, the Court must do both—evaluate the sale for a sound business purpose under § 363 and also determine whether the sale meets the fair-and-equitable standard used to analyze compromises under Fed. R. Bankr.P. 9019. *See Simantob v. Claims Prosecutor, LLC (In re Lahijani),* 325 B.R. 282, 290 (9th Cir. BAP 2005) (proposed sale of causes of action must be

---

**24.** The State Court also stated that "the pending motion for partial summary judgment deals with liability for failure to install meters and not with the responsibility for the payment of the same." *Id.* at 15.

analyzed under both § 363 and as a compromise under the fair-and-equitable standard); *Valucci v. Glickman, Berkovitz, Levinson & Weiner (In re Glickman, Berkovitz, Levinson & Weiner)*, 204 B.R. 450, 455 (E.D.Pa.1997) (remanding bankruptcy court's approval of asset sale that included settlement of prepetition claims held by debtor so bankruptcy court could consider whether transaction met the best-interest-of-creditors standard); *In re Buffalo Coal Co.*, 2006 WL 3359585 at *4 (Bankr. N.D.W.Va. Nov.15, 2006) ("Once bundled [as a sale and compromise] . . . the bankruptcy court should make the independent determination that both the sale and the compromise should be approved."). Although the two standards arguably overlap in that they both take into consideration the best interest of creditors, the tests are analytically distinct and most clearly addressed separately. *See Lahijani*, 325 B.R. at 290 (analyzing transaction under sale standard separately from compromise standard).

## A. Evaluation of the Asset Sale Under 11 U.S.C. § 363

The Trustee seeks an order authorizing the sale of the Assets to TCO free and clear of all liens, claims and interests. Section 363(b)(1) of the Bankruptcy Code authorizes a trustee, after notice and a hearing, to "use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ." 11 U.S.C. § 363(b)(1). Property of the estate may be sold free and clear of any interests in the property held by an entity other than the estate under the following circumstances:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

NEM has asserted an interest in the Assets based upon its belief that the value of the Assets "exceeds the legitimate claims of creditors." Sale Motion at 15. The Trustee contends that NEM's interest, however, "arises from an unauthorized and illegal transfer" that NES allegedly made post-petition after the Trustee was appointed. *Id.* Thus, according to the Trustee, NEM's purported interest is in bona-fide dispute. *Id.* "A 'bona fide dispute' exists under § 363(f)(4) when there is an objective basis for either factual or legal dispute as to the validity of an interest in property." *In re Downour*, 2007 WL 963258 at *1 (Bankr.N.D.Ohio Mar.28, 2007). There is an objective basis for such a dispute here. The Court need not decide whether NEM's or the Trustee's allegations are true in order to conclude that NEM's interest is in bona-fide dispute for purposes of § 363(f)(4). "The case law construing § 363(f)(4) is uniform in holding that [the § 363(f) ] standard does not require the court to resolve the dispute, just to determine its existence." *Id.; see also Union Planters Bank, N.A. v. Burns (In re Gaylord Grain L.L. C.)*, 306 B.R. 624, 627 (8th Cir. BAP 2004) (application of 363(f)(4) "does not require the court to resolve the underlying dispute, just to determine its existence"). The Court therefore concludes that the Trustee may sell the Assets free and clear of NEM's asserted interest.

The Assets consist of the litigation claims against TCO that are pend-

ing in the State Court case. The sale of estate property under § 363 "is not restricted to tangible personalty." *In re Dow Corning Corp.*, 198 B.R. 214, 247 (Bankr.E.D.Mich.1996). Rather, § 363(a) contemplates "that many forms of intangible personalty are included within the trustee's power to use, sell, or lease property of the estate." *Id.* What constitutes the kind of property a trustee may sell under § 363 is very broad in scope and "include[s] a trustee's alienation of a chose in action...." *Id.* Thus, a debtor's sale of litigation claims, such as the assets to be sold under the APA, is permissible.[25]

 Determining whether a sale should be approved under § 363 "falls within the sound discretion of the trial court." *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 388 (6th Cir.1986) (internal quotation marks omitted). *See also In re New Era Resorts, LLC*, 238 B.R. 381, 387 (Bankr.E.D.Tenn.1999) ("[T]he court has broad discretion in determining whether to approve a sale other than in the ordinary course of business."); *In re Embrace Sys. Corp.*, 178 B.R. 112, 123 (Bankr.W.D.Mich. 1995) ("A large measure of discretion is available to a bankruptcy court in deter-

mining whether a private sale should be approved. The court should exercise its discretion based upon the facts and circumstances of the proposed sale." (citation omitted)). In *Stephens Industries*, the Sixth Circuit stated that "a bankruptcy court can authorize a sale of all of a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action." *Stephens Indus.*, 789 F.2d at 390. Thus, when deciding whether to approve a § 363 sale, a court must " 'expressly find from the evidence presented before [it] at the hearing a good business reason to grant such an application [to sell].' " *Id.* at 389 (quoting *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir.1983)). The party seeking approval of the sale bears the burden of demonstrating that there is a sound business purpose for the sale. *See Lionel*, 722 F.2d at 1071. The objecting party must "produce some evidence respecting its objections." *Id.*

 The *Lionel* court provided a roadmap—which was followed by the Sixth Circuit in *Stephens Industries*—to guide bankruptcy courts when deciding whether

**25.** This conclusion also finds support in the definition of property of the estate under § 541, which provides that the estate is comprised of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Numerous courts have interpreted the § 541 definition to include causes of action. *See, e.g., Cable v. Ivy Tech State Coll.*, 200 F.3d 467, 472–73 (7th Cir. 1999) ("The phrase 'legal or equitable interests ... in property' includes choices in action and other legal claims that could be prosecuted for the benefit of the estate."); *Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir.1988) ("[I]t is well established that the interests of the debtor in property include causes of action." (internal quotation marks omitted)); *Lahijani*, 325 B.R. at 287 ("Causes of action owned by the trustee

are intangible items of property of the estate that may be sold. These include causes of action owned by the debtor as of the filing of the case."); *Darrah v. Franklin Credit (In re Darrah)*, 337 B.R. 313, 316 (Bankr.N.D.Ohio 2005) ("Choices-in-action ... are included within this broad definition [of estate property]."); *Buckeye Union Ins. Co. v. Four Star Constr. Co. (In re Four Star Constr. Co.)*, 151 B.R. 817, 819 (Bankr.N.D.Ohio 1993) ("Among these legal interests [in § 541] are the debtor's choices in action and claims against third parties in existence as of the petition filing date."); *In re Carson*, 82 B.R. 847, 851 (Bankr.S.D.Ohio 1987) ("It is well-established that the broad scope of § 541 encompasses causes of action existing at the time of the commencement of the bankruptcy action.").

there is a sound business purpose for a proposed sale:

> In fashioning its findings, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value. This list is not intended to be exclusive, but merely to provide guidance to the bankruptcy judge.

*Id.; Stephens Indus.*, 789 F.2d at 389. Stated differently, the sound-business-purpose test requires "1) [a] sound business reason; 2) accurate and reasonable notice; 3)[an] adequate price; and 4) good faith." *In re Country Manor of Kenton, Inc.*, 172 B.R. 217, 220 (Bankr.N.D.Ohio 1994).

### 1. A Sound Business Reason Exists for the Sale, and It is in the Best Interest of the Estate.

■ During the Hearing, the Trustee established that there is a sound business reason for the sale of the Assets to TCO and that the sale is in the best interest of the NES estate. *See In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 552 (Bankr. N.D.Ill.1994) ("Where an objection [to a sale motion] is made, the standard to be applied by the court in approving a dispo-

sition of assets is variously stated, but the general thrust is that the proposed sale should be in the best interest of the estate."); *In re Planned Sys., Inc.*, 82 B.R. 919, 923 (Bankr.S.D.Ohio 1988) ("In determining whether or not to approve the sale . . . the Court must determine whether such sale is in the best interest of the estate."). NES is not a debtor capable of reorganization. As noted above, the Debtor had filed a certificate of dissolution and was winding up its corporate affairs as of the Petition Date. It has no operations, nor any ongoing business. The Trustee recognized NES's inability to reorganize soon after his appointment and stated that he "filed a report early on in the case . . . in which [he] indicated that [he] did not believe that a business reorganization of [NES] was possible under Chapter 11 and that from that point forward [he] treated the case as a liquidation case." Hearing Tr. I 112:4–8. The sale of the Assets furthers the goal of liquidation under Chapter 11. *See Lionel*, 722 F.2d at 1071 (courts should consider "the likelihood that a plan of reorganization will be proposed and confirmed in the near future [and] the effect of the proposed disposition on future plans of reorganization").

The sale provides a significant benefit to NES's unsecured creditors—a factor strongly militating in favor of the sale's approval. *See, e.g., New Era Resorts*, 238 B.R. at 387 (approving sale when it provided a benefit to creditors). In exchange for the Assets, TCO will pay a purchase price of $2.7 million dollars. In addition to the purchase price, TCO will pay various administrative and litigation expenses that would otherwise be borne by the estate, including the Trustee's § 326 statutory fee as well as certain litigation expenses that he may incur to pursue the Substantive Consolidation Action. *See* Hearing Tr. I 46:1–52:5. TCO will not

reduce the purchase price by the amount of these expenses. *Id.* at 51:1–5. TCO and the Columbia Entities also agree to the subordination of their claims, which, as filed, total approximately $3.9 million.[26] *Id.* at 54:13–24.

Taking into consideration the funds TCO will pay to or on behalf of the estate, the Trustee anticipates—after taking into account Sanders's contingency fee—a net distribution of $1,568,600 to the holders of allowed unsecured claims. *Id.* at 52:6–9. The projected dividend to these unsecured creditors is 41%. *Id.* at 57:15–17. In addition to the significant projected distribution, the sale will result in a more timely return to creditors than if the Trustee were successful at trial and on appeal in the State Court. *Id.* at 73:1–12. There are no other assets available for creditors unless the Trustee is able to recover assets in the Substantive Consolidation Action. *Id.* at 112:9–13. Most importantly, the sale ensures a distribution to unsecured creditors. The Trustee cannot guarantee any return to creditors if the State Court case proceeds to trial and through subsequent appeals. *Id.* at 112:21–24.

 During cross-examination, counsel for NES asked the Trustee why his initial settlement demand to TCO was only $4.7 million when Selby and Bodamer opined that the alleged damages exceed $36 mil-

lion. In response, the Trustee stated that he "thought $4,700,000.00 was a sufficient amount of money to provide an opportunity to make a reasonable return to creditors. . . ." *Id.* at 118:23–119:1. The Trustee also believed that a settlement demand in an amount much higher than his original demand may well have ended the negotiations. *See id.* at 124:16–24 ("Are you asking me if I had any basis to take a position in the settlement negotiations that TCO should pay eight or ten million dollars? . . . I would have had a basis to say that. . . . I didn't because *I knew that would have brought the discussions to an end.*" (emphasis added)).[27]

The proposed distribution to creditors, in fact, exceeds the Committee's expectations. As Committee member James W. Donchess ("Donchess")[28] testified, "[t]he position of the creditors was that . . . we shouldn't give the case away for a nominal amount but that if we could achieve a settlement, something that would return at least after fees and expenses and everything, would return 25% or more to creditors that we should settle the case." Hearing Tr. II 345:7–13. Donchess also stated that the sale of the claims to TCO serves a sound business purpose "because it recovers a substantial amount of money for the creditors of Nicole and in our case the creditors of AGF to whom we [the Chapter 7 Trustee of AGF Direct Gas]

---

26. As noted above, however, the Columbia Entities' claims are not subordinated to the extent of any additional distribution by the Trustee from assets he may recover in the Substantive Consolidation Action. *Id.* at 48:22–49:6.

27. The Court recognizes that a settlement in the range of $8 million to $10 million is significantly higher than the proposed sale amount. Yet the Court may approve the terms of the sale so long as they are in the best interest of the estate and the sale amount does not fall below the range of reasonableness. *See, e.g., Dow Corning,* 198 B.R. at 222 (when reviewing a settlement, "the obligation

of the court is to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness" (internal quotation marks omitted)).

28. Donchess is an attorney with the firm of Donchess & Notinger in Nashua, New Hampshire. He is a member of the Committee, representing Steve Notinger, Chapter 7 Trustee for the AGF Direct Gas estate. Hearing Tr. II 332:7–19. Donchess has experience in representing a *Chapter 7 trustee* in bankruptcy-related matters and also has general litigation experience. *Id.* at 333:1–13.

also owe a fiduciary duty to try to recover money." *Id.* at 346:17–19. Finally, Donchess testified that the creditors will benefit from TCO's assumption of the administrative liabilities and expenses, *id.* at 353:21–24, and that he believes the sale is "fair and equitable and in the best interest of the estate[.]" *Id.* at 370:21–24. *See also* Trustee Ex. 54, McMichael Dep. 40:25–41:1, Dec. 28, 2006 ("The settlement is fair, equitable, and in the best interest of the estate."); *id.* at 70:11–20 (On cross-examination, McMichael—another member of the Committee—stated that "the creditors feel like it is in the best interest of the creditors to resolve the N[ES] bankruptcy in as expeditious and efficient manner as possible to reduce any further cost on the estate and to bring this matter to closure rather than prolong the matter and have the potential of further litigation, further appeals, and whatnot that would undoubtedly take more money from the creditors and greatly lengthen the time of the recovery of the creditors.").

The Objecting Parties failed to produce any evidence, persuasive or otherwise, to demonstrate that the Trustee lacks a sound business reason for the sale or that the sale is not in the best interest of the estate. Thus, based on the testimony presented, the Court finds that a sound business reason exists for the sale of Assets to TCO. The Court also finds that the sale is in the best interest of the estate and NES's creditors.

### 2. The Sale to TCO Reflects the Highest and Best Offer for the Assets.

The Trustee structured the settlement as a § 363 sale for several reasons. Foremost, as he testified, the Trustee "was hopeful that there would be competitive bidding that might result in a higher distribution to unsecured creditors." Hearing Tr. I 87:14–16. *See New Era Resorts,* 238 B.R. at 387 ("The burden falls on the debtor to show that it has obtained the best possible price for the asset."); *Embrace Sys.,* 178 B.R. at 123 ("When a debtor desires to sell an asset, its main responsibility, and the primary concern of the bankruptcy court, is the maximization of the value of the asset sold. In general, a debtor must demonstrate that the proposed purchase price is the highest and best offer." (citation omitted) (internal quotation marks omitted)). He also wanted to provide parties with the "opportunity to match or exceed the value" proposed for the Assets in order to overcome or resolve any objections on the basis of "inadequate value." Hearing Tr. I 87:18–21. More specifically, the Trustee "wanted to provide a framework in which Mr. Fulson would be able to regain control of the [S]tate [C]ourt case if he wanted to by basically buying the claim and paying off the creditors." [29] Hearing Tr. I 87:21–24. By offering essentially "the world" an opportunity to participate in the bidding process, the Trustee felt that the sale efforts would allow him "to determine whether the asset [wa]s being substantially undervalued." *Id.* at 88:13–14.

McMichael assisted the Trustee in his efforts to determine whether there was any interest within the distressed-debt or private-equity markets in purchasing NES's claims after entry of the State Court Decision. McMichael Dep. 20:7–9,

---

29. The Trustee's framework also garnered support from Donchess "because anyone who thought the claims were worth more than the settlement including Mr. Fulson or any of the other Nicole entities could have bid more or could have submitted a ... [s]ubstitute asset purchase agreement for an amount greater than was being paid by Columbia...." Hearing Tr. II 350:1–8.

27:12–21. Initially, McMichael sent a letter he had received from the Trustee, along with a copy of the State Court Decision and the Damages Report, to distressed-debt brokers. *Id.* at 30:6–10. Five of the seven brokers he contacted responded by stating that they had no interest in purchasing the claims and that they did not know of anyone who would be interested. *Id.* at 32:10–12. McMichael received some interest from Liquidity Solutions, but that entity did not submit a proposal. *Id.* at 32:13–20. He also had numerous conversations with representatives from Credit Suisse First Boston ("CSFB") regarding the status of the claims and the negotiations with TCO. *Id.* at 32:21–33:2. Despite these inquiries, CSFB "never provided a proposal in writing and later said that there was too much risk in it and that their management committee would not approve [CSFB's] pay[ment] [of] any material amount up-front...." *Id.* at 33:11–15.

In an effort to solicit additional bids, the Trustee published a notice of the sale on the web site of Platts Gas Daily—a leading gas industry publication. Hearing Tr. I 97:17–21. *See also* Trustee Ex. 48. It appears that the notice was published on the web site from November 28, 2006 to December 4, 2006. *See id.* According to the Trustee, the notice received 7,652 visits. Hearing Tr. I 99:18–20; Trustee Ex. 48.

The Trustee served the Sale Motion, which was accompanied by a copy of the APA, and the Sale Notice to all creditors and parties in interest. Hearing Tr. I 42:5–8, 13–15, 17–19; Trustee Exs. 1, 2. The Trustee also served notice of the amendment to the APA on all creditors and parties in interest. Hearing Tr. I 44:10–13; Trustee Ex. 3.

The Objecting Parties question the adequacy of the notice provided to creditors and parties in interest. NES contends that the Sale Notice and Sale Motion did not provide sufficient information regarding the amount of expenses, including attorney's fees, that a potential bidder would incur under the APA. The Trustee responded by pointing out that an interested party needed only to request more specific figures and, in fact, at least two parties asked him for that information. Hearing Tr. I 136:5–137:25. NEM disputed the sufficiency of notice to equity holders, but the Trustee testified that he had "[n]otified parties in interest [and] equity holders of the settlement ... and [NEM's] counsel of record in the case ... [would have] received all notices." *Id.* at 183:9–13.

■ The Court finds that service of the Sale Motion, the Sale Notice and the proposed amendment to the APA was sufficient under Fed. R. Bankr.P.2002 and 6004. *See* Trustee Exs. 1, 2, 3. The notices and motions that the Trustee served provided creditors and parties in interest with adequate information as to (1) the nature of the claims being sold under the Sale Motion, (2) how to participate in the bidding process, if interested, and (3) the date by which any objections were to be filed and served. *Id.* In addition, the Court finds that the efforts undertaken by the Trustee to market the Assets were more than adequate.

■ The Court acknowledges that in asset sales where, as here, "there is only one bidder ... the price offered is less likely to be reliable and should be examined more carefully...." *Schugg v. Lyon (In re Schugg)*, 2006 WL 1455568 at *11 (D.Ariz. May 22, 2006) (citing *Lahijani*, 325 B.R. at 289). This is the case especially where the winning bidder for a claim held by the estate is the defendant in the litigation in which the claim is being asserted. *See Lahijani*, 325 B.R. at 289. Here, the Court has given careful and

heightened scrutiny to this transaction and concludes that the Assets were adequately marketed, and the purchase agreement between the Trustee and TCO will yield the highest and best price for the Assets.

### 3. The Trustee and TCO Negotiated and Entered into the APA at Arm's Length and in Good Faith.

█ The Trustee also demonstrated that he and TCO negotiated the terms of the APA in good faith and at arm's length. A negotiation or transaction is conducted at "arm's length" if it is " 'between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power[.]' " *Allegheny Ludlum Corp. v. United States*, 367 F.3d 1339, 1348 (Fed.Cir.2004) (quoting Black's Law Dictionary 103 (7th ed.1999)); *see also Cedar View, Ltd. v. Colpetzer*, 2006 WL 456482 at *2 (N.D.Ohio Feb.24, 2006) (following Ohio law in defining an arm's-length transaction "as characterized by the following elements: it is voluntary, i.e., without compulsion or duress; it generally takes place in an open market; and the parties act in their own self-interest").

Some courts have held that "when a bankruptcy court authorizes a sale of assets pursuant to section 363(b)(1), it is required to make a finding with respect to the 'good faith' of the purchaser." *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149–50 (3d Cir.1986). *See also In re Condere Corp.*, 228 B.R. 615, 630 (Bankr.S.D.Miss.1998) (same). Other courts, although not requiring an affirmative finding of good faith, have stated that such a finding is a "good idea[,]" *In re Tamojira, Inc.*, 212 B.R. 824, 827 n. 5 (Bankr.E.D.Va.1997), or have acknowledged that "no bankruptcy judge is likely to approve a sale that does not appear to be in 'good faith[.]' " *Thomas v. Namba (In re Thomas)*, 287 B.R. 782, 785 (9th Cir.

BAP 2002). *See also Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 389 (2d Cir.1997) ("Bankruptcy courts routinely make a finding of good faith at the time of the § 363 sale approval."); *Country Manor*, 172 B.R. at 221 (denying sale motion where court was unable to find, based on the evidence, that purchaser's offer was made in good faith). In addition, higher courts appear to be "consistent in remanding the matter to the bankruptcy court for a determination of good faith when the issue surfaces" on appeal. *Whiting v. Gillman (In re Whiting)*, 325 B.R. 339 (table), 2005 WL 1220494 at *5 (10th Cir. BAP 2005). The Court need not and therefore does not reach the issue of whether an affirmative finding of good faith is required to approve a sale. Such a finding, however, is appropriate here.

█ "The 'good faith' requirement, although not expressly contained in § 363(b), has been grafted on to the approval of sales ... because that requirement appears in § 363(m) governing appeals...." *In re Congoleum Corp.*, 2007 WL 1428477 at *2 (Bankr.D.N.J. May 11, 2007). "[T]ypically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidder[s]." *In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D.Ohio 1992) (internal quotation marks omitted). In assessing the good faith of a purchaser, courts have considered factors such as: (1) whether the sale was negotiated at arm's length, *see id.*; (2) whether any officer or director of the debtor holds any interest in or is otherwise related to the potential purchaser, *see id.*; and (3) whether fraud or collusion exists among the prospective purchaser, any other bidders or the trustee. *See Abbotts Dairies*, 788 F.2d at 147.

The Trustee and TCO are not related parties. Both sides possessed equal bargaining power in negotiating the sale and compromise. The Trustee testified that TCO acted in good faith during their negotiations,[30] Hearing Tr. I 99:23–25, and that, at all times, TCO was only motivated by a "sincere desire to settle the [S]tate [C]ourt case on mutually agreeable terms[.]" *Id.* at 108:4–8. On cross-examination, the Trustee reiterated his belief that TCO was acting in good faith when negotiating the settlement, stating that there was a lack "of the appearance of any ulterior motive, any motive other than a sincere desire to settle the case on mutually acceptable terms." *See id.* at 168:6–7.[31]

There was no fraud or collusion between the parties. Although the Objecting Parties attempted to raise the specter of fraud or collusion by pointing to the large differential between the settlement amount and the damages claim, the Trustee offered a viable explanation of why TCO did not offer more than the purchase price to settle the claims. The Columbia Entities asserted claims against the estate in the amount of $3.9 million. As explained by the Trustee, "if a verdict, for example, was rendered in the $8,000,000.00 range [Rick Farmer ("Farmer")—the representative from NiSource Inc. (TCO's parent company) who negotiated the settlement on behalf of TCO] felt that half of that money would come back to the Columbia [E]ntities so he couldn't put a value on a claim higher than [the amount of the Columbia Entities' claim]." *Id.* at 106:11–14. Thus, settling the claim for significantly less than the alleged damages—even in an amount approximately ten times less—did not cause the Trustee to question TCO's motivations for settlement. *Id.* at 168:12.[32]

The Objecting Parties offered no evidence to rebut the Trustee's testimony

30. The Trustee conducted the negotiations instead of Sanders, his special counsel. The Trustee believed it was the best allocation of resources for Sanders to focus only on the litigation, and that ultimately his "fiduciary duty required that at the end of the day [he] would have to make the decision on any settlement." Hearing Tr. I 100:23–101:3. As the case developed, the Trustee also discovered that Sanders was involved in other litigation on behalf of Fulson and the Nicole-affiliated entities, which gave him "some concern about how effective [Sanders] would be in conducting negotiations with TCO. . . ." *Id.* 101:4–7.

31. During cross-examination of the Trustee, NES attempted to characterize TCO's decision to file the involuntary petition as an indication that TCO did not settle the claims asserted in the State Court case in good faith. *See id.* at 168:20–170:7. The Court rejects this argument because NES subsequently consented to the jurisdiction of this Court by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code and also consented to the appointment of a Chapter 11 trustee. The Court concludes that the decision made by TCO or the LDCs to commence the involuntary case has little or no bearing on the issue of whether TCO entered into the APA at arm's length or in good faith. The Court also notes that three other creditors moved to join in the involuntary petition under § 303(c).

32. At an initial meeting, TCO expressed its view to the Trustee "that the case had nothing more than nuisance value." Hearing Tr. I 102:14–15. TCO did not make a settlement offer at the initial meeting, and the Trustee advised TCO that he "wasn't interested in discussing a settlement in that [nuisance-value] range." *Id.* at 102:18–21. Subsequent to that meeting, TCO offered to settle the case for $350,000, which the Trustee rejected. He again advised TCO that he was not interested in discussing settlement for a nuisance value. *Id.* at 103:5–13. The Trustee also did not consider an offer by TCO in the $750,000 to $800,000 range. *Id.* at 104:16–25. Instead, he "told [Farmer] that settlement level was inadequate and I thought he should review the matter with his management and contact me further." *Id.* at 105:2–4.

that the APA was negotiated in good faith and at arm's length. Rather, the Trustee provided a solid and credible account of the negotiations, and his testimony persuades the Court that the APA is the result of a strong and sincere desire by the parties to settle the State Court case on mutually acceptable terms. The Court accordingly finds that the parties exercised good faith and negotiated the terms of the APA at arm's length.

### 4. The Trustee Has Established the Elements Required for Court Approval of a § 363 Sale.

Based on the foregoing, the Court concludes that there is a sound business reason for the Trustee's proposed sale of the Assets under the APA. The sale is in the best interest of the NES estate and its unsecured creditors, and the terms contained in the APA reflect the highest and best offer—indeed, the only offer—received by the Trustee. The Objecting Parties failed to offer any persuasive evidence to challenge the Trustee's sound business reasons for consummating the sale. They offered no evidence of competing bids or any evidence suggesting that the Trustee failed to accept the highest and best offer for the Assets. Nor did the Objecting Parties offer any evidence to rebut the testimony that the negotiations resulting in the APA were conducted at arm's length and in good faith. In sum, the Trustee has made the showing required to gain approval of the sale under § 363(b).

### B. Evaluation of the Asset Sale as a Compromise Under Fed. R. Bankr.P. 9019

Before approving the sale, the Court also must determine that the proposed compromise that it effectuates is fair and equitable. Federal Rule of Bankrupt-

cy Procedure 9019 governs the approval of compromises in bankruptcy cases and states as follows: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct." Fed. R. Bankr.P. 9019(a). The Supreme Court has recognized the importance of compromises as "a normal part of the process of reorganization[,]" noting that "[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims as to which there are substantial and reasonable doubts." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968) (citation omitted) (internal quotation marks omitted). In *TMT Trailer,* the Supreme Court also articulated the fundamental rule that compromise proceedings must receive the "informed, independent judgment of the bankruptcy court." *Id.* (internal quotation marks omitted). This rule imposes a strict standard upon the court reviewing a proposed compromise and requires the bankruptcy judge to:

> apprise[ ] himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the

compromise with the likely rewards of litigation. *Id.* at 424–25, 88 S.Ct. 1157.

▮▮▮▮▮ The bankruptcy court should not accept without question a trustee's mere conclusions proffered in support of a proposed compromise. *Id.* at 433–34, 88 S.Ct. 1157. *See also Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469, 473 (6th Cir.1988) ("The court is not permitted to act as a mere rubber stamp or to rely on the trustee's word that the compromise is 'reasonable.' "). Nor may the court articulate perfunctory findings when approving a compromise. Instead, "[i]t is essential . . . that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boilerplate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law." *TMT Trailer*, 390 U.S. at 434, 88 S.Ct. 1157. Likewise, the court may not approve a compromise on the sole basis that creditors do not oppose the terms of the compromise. *Id.* at 435, 88 S.Ct. 1157 ("When a bankruptcy court either fails adequately to investigate potential legal claims held by the debtor, or refuses to provide an adequate explanation of the basis for approving compromises, it is scarcely surprising that creditors fail to come forward with objections to the compromises."). By contrast, affirmative support from a committee of unsecured creditors is a factor weighing in favor of approval of the proposed compromise. *See Fishell v. Soltow (In re Fishell)*, 47 F.3d 1168 (table), 1995 WL 66622 at *3 (6th Cir.1995) (requiring some deference to reasonable views of creditors).

▮▮▮▮▮ Since *TMT Trailer*, the Sixth Circuit has articulated a "fair-and-equitable" standard that bankruptcy courts must apply when reviewing proposed compromises. In *Bauer*, 859 F.2d at 441, for instance, the Sixth Circuit stated that "the court is obligated to weigh all conflicting interests in deciding whether the compromise is 'fair and equitable,' considering such factors as the probability of success on the merits, the complexity and expense of litigation, and the reasonable views of creditors." *See also Fishell*, 1995 WL 66622 at *3 (stating that courts must evaluate "the fairness and equity of a proposed compromise"); *Olson v. Anderson (In re Anderson)*, 377 B.R. 865, 871 (6th Cir. BAP 2007) ("Although published Sixth Circuit case law on Rule 9019 settlements is relatively sparse, in unpublished decisions the Court of Appeals and Bankruptcy Appellate Panel have consistently reaffirmed their adherence to the 'fair and equitable' standard."). The bankruptcy judge must " 'apprise himself of the relevant facts and law so that he can make an informed and intelligent decision, and set out the reasons for his decision.' " *Fishell*, 1995 WL 66622 at *3 (quoting *LaSalle Nat'l Bank v. Holland (In re Am. Reserve Corp.)*, 841 F.2d 159, 163 (7th Cir.1987)). *See also Porter Drywall Co. v. Haven, Inc. (In re Haven, Inc.)*, 2005 WL 927666 at * 3 (6th Cir. BAP Apr. 7, 2005) (same). The *Fishell* court also enumerated specific factors a court should consider when reviewing a compromise to determine whether it meets the fair-and-equitable standard:

(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Fishell*, 1995 WL 66622 at *3; *see also Bard v. Sicherman (In re Bard)*, 49 Fed.

Appx. 528, 530 (6th Cir.2002) (same); *Carson,* 82 B.R. at 853 (same).

 "Whether a compromise should be accepted or rejected lies within the sound discretion of the Court." *Planned Sys.,* 82 B.R. at 921; *see also Carson,* 82 B.R. at 852 (same). A court may consider the objections of other creditors or parties in interest, but the objections are "not controlling and will not prevent approval by the Court." *Carson,* 82 B.R. at 852. The Court must ultimately "canvass the issues in order to determine whether the settlement 'falls below the lowest point in the range of reasonableness.'" *Id.* at 853 (quoting *Cosoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599, 608 (2d Cir.1983)). *See also In re Tri–State Ethanol Co.,* 370 B.R. 222, 229 (Bankr.D.S.D.2007) ("[A]s long as the settlement falls within a range of reasonable compromises, it may be approved."); *Telesphere Commc'ns,* 179 B.R. at 553 ("[A] challenged settlement fails this test only if it falls below the lowest point in the range of reasonableness." (internal quotation marks omitted)).

### 1. Probability of Success

 The Court must first evaluate the probability of success were the Trustee to continue the State Court litigation on behalf of the NES estate. "This step requires the court to estimate both the value of the proposed settlement and the likely outcome of litigating the claims proposed to be settled." *Telesphere Commc'ns,* 179 B.R. at 553. The Court need not make a precise determination of the outcome, however, "since 'an exact judicial determination of the values in issue would defeat the purpose of compromising the claim.'" *Id.* (quoting *In re Energy Coop., Inc.,* 886 F.2d 921, 929 (7th Cir.1989)).

There are three major hurdles NES must overcome in order to succeed in the State Court. At trial, NES would have to establish that TCO in fact under-credited NES for the amount of gas produced at the NGP wells. If NES were able to prove that there was an actual under-credit, it would then need to establish the amount of the under-credit. And, finally, NES would have to prove a causal connection between TCO's failure to properly credit NES's account and the damages NES alleges it sustained as a result of the under-crediting. *See* Hearing Tr. I 61:1–7. Another pivotal issue that remains for trial is the actual price that NGP charged NES per decatherm of gas. If a jury were to find that the price was not $2.85 per decatherm—as assumed throughout the Damages Report—such a finding could adversely affect the amount of damages, if any, awarded to NES. Hearing Tr. II 297:25–298:14.

Based on the Court's review of the record, the likelihood that NES would have succeeded on any of the foregoing issues is tenuous at best. To succeed on all of these issues—and eventually obtain a monetary judgment, the net present value of which would meaningfully exceed the amount of the proposed settlement—seems highly improbable. As explained below, several factors weigh against NES's probable success at trial.

### a. Discrepancy Between the Damages Report and the Actual Damages

The most significant hurdle NES would have to overcome would be proving a causal connection between TCO's failure, if any, to properly credit NES's account and the damages NES claims it sustained as a result of the under-crediting. A considerable portion of the Trustee's testimony centered on this point. In his analysis, the Trustee initially assumed that the State Court would deny the parties' respective

motions to exclude the expert testimony, but would admit evidence regarding the Substantive Consolidation Action. *See* Hearing Tr. I 71:8–20. He also concluded that NES "would probably be able to establish that there had been an under-crediting of gas that had been delivered into the pipeline system but that the amount of under-crediting was unknowable." *Id.* at 72:1–4. After reviewing all the information that was made available to him, however, the Trustee ultimately concluded that "there was a high probability that Nicole would not be able to sustain its burden of proof on the causal connection between the under-crediting, if there was any, and damages of the magnitude reflected in the *Report of Economic Damages*." *Id.* at 72:11–15. The Trustee based his conclusion on a number of factors.

The Trustee expressed doubts about the Damages Report, stating that "[t]here are assumptions made in the report in a number of places which I believe are subject to serious challenge and may be unsupportable." *Id.* at 116:19–21. When asked on cross-examination whether he lacked confidence in the Damages Report, the Trustee responded by saying that he had "serious reservations about the quantity of the damage claim. It is based upon future profits from hypothetical future business. Yes, in that sense I lacked confidence in it." *Id.* at 119:5–8. The Trustee made his assessment of the Damages Report from a review of numerous documents, including financial documents, corporate books and records, tax returns and an audit, along with the work papers that accompanied the audit. *Id.* at 120:25–121:9. From the Trustee's perspective, "all of the evidence that I saw in those documents, coupled with the prior history of the Nicole entities, gave me concern about the viability of Nicole, the Nicole enterprise as of [the] '99, 2000 time period." *Id.* at 121:9–12. Moreover, the Trustee has alleged in the Substantive Consolidation Action that during 1999 and 2000, NES and its related entities were insolvent. *See* Trustee Ex. 54 at 8. He had made this determination prior to receiving the Damages Report. Hearing Tr. I 122:6–8 (The Damages Report is dated March 31, 2006; the Trustee filed the Substantive Consolidation Action in November 2005.).

At all stages of the State Court litigation, TCO has strenuously contested the existence of any causal connection between the purported under-crediting and the alleged damages. James C. Wright ("Wright"), counsel for TCO, testified on behalf of the Trustee as to the arguments TCO would have made if the matter had proceeded to trial.[33]

At the outset, TCO rejects NES's contention that there was an under-credit of 496,644 decatherms of gas to NES's account. *See* Hearing Tr. II 422:3–6. According to Wright, TCO would also take

---

**33.** Despite the ruling in the State Court Decision that TCO was required under the Tariff to install and maintain meters on the unmetered wells, *see supra* Part V.C., Wright testified that TCO "[d]oesn't believe that under the [T]ariff that it had an obligation to install meters." Hearing Tr. II 414:20–21. TCO's belief as to this point of contention, however, would have no import at the trial court stage of the litigation because the State Court had already determined as a matter of law that TCO had breached its contract by failing to install and maintain meters on the unmetered wells. At trial in the State Court, TCO would have proffered documentary evidence and testimony regarding the parties' course of dealing in order to preserve its appeal rights. *Id.* at 415:1–11. And if TCO were unsuccessful at trial, it intended to appeal the State Court Decision. *Id.* at 418:13–16. But for purposes of its analysis, the Court has assumed that the State Court Decision would have foreclosed TCO from presenting evidence of the parties' course of dealing in order to attempt to convince jurors that it had no contractual obligation to install meters.

the position at trial that NES—not TCO—was the party responsible for generating the data necessary for calculating the credits. *Id.* at 422:21–25 ("TCO's contention is Nicole is responsible for [data collection] through its field personnel."). TCO would further dispute that NES suffered damages as a result of TCO's delay in crediting NES's account. As stated by Wright, "there was no damage caused by any delay because there was in fact no delay." *Id.* at 423:11–13. TCO also would attempt to discredit NES's ability to produce a daily load in a quantity sufficient to support the damages claim.

> Based upon the wells at issue, the yearly production for those wells at best was about 350,000 decatherms for the entire year.... [W]e believe that they can't prove to a reasonable degree of certainty that they would be able to easily build to a load of 80,000 decatherms per day. The gas at issue at these wells would account for a hair over 1% of what they'd need for a whole year.

*Id.* at 431:10–17.

TCO completely discounts NES's ability to establish a causal relationship between the asserted under-crediting and the damages NES allegedly sustained. One point of contention is the applicability of a correction factor to the one-minute-pickup test. Wright summarized TCO's position as follows: "Essentially, there's a disconnect ... between the motion for summary judgment that was granted with respect to Judge Reece's decision on the metering issue and how the damages have even been attempted to be quantified in terms of a[n] under-credit b[y], just lop[p]ing off the correction factor." *Id.* at 424:14–20. During cross-examination, he further elaborated on TCO's position that the correction factor is necessary to accurately quantify the gas production:

> A: And, as I said, there's a disconnect though between the motion that Ni-

cole obtained with respect to [the] require[d] metering and then the attempt to simply quantify the alleged under-credits by taking the minute pickup and just subtracting a correction factor. Our experts, on behalf of TCO, contended that minute pickup tests can be used but it must have a correction factor because that is what ties the minute pickup to a meter.

> Q: Alright. Where is this correction factor either created or made enforceable?

> A: Are you asking me scientifically where it comes from?

> Q: No, is it a matter of law, is it a matter of contract. You said it's imposed. Where did it come from?

> A: It came because that's how they had been measuring these wells for a 100 years in some instances.

> Q: So are you then telling the Court that this was not an express provision of the contract, that it was enforceable?

> A: Yes, by course of dealings.

> Q: Is there a provision in the contract that says that all of the terms are in writing and included in the contract?

> A: To be honest with you, I don't have the [T]ariff in front of me. It wouldn't surprise me if it had something like that but I don't have it in front of me. But that doesn't mean the course of dealing[ ] also is not potentially relevant and helpful under the case law.

> Q: I'm not saying that it is. I'm just trying to understand how you're telling the Court that becomes enforceable. You criticize Nicole's position regarding it and I want to know what makes TCO's position prevail.

A: I'm not criticizing it. What I'm saying is there's a disconnect between the motion for summary judgment for meters and then the attempt to quantify how the alleged under-credits occurred and to measure them.

*Id.* at 445:23–447:14.

The most compelling evidence demonstrating the difficulties that NES would experience in proving the causal connection, however, was the testimony provided by Dr. Richard A. Riley, Jr. ("Riley"), who was to be called as an expert witness for TCO in the State Court case.[34] In reaching his conclusion that a causal connection does not exist, Riley expressed his opinion as to three primary weaknesses in NES's case—NGP's historical production of gas, the financial stability and viability of NES and its related entities, and the nature of the NES business plan as compared to the alleged damages sustained. Riley's testimony included considerable statistical information concerning historical gas production by NGP and the financial track record of the Nicole entities, and his conclusions are numbers-driven. Because the Court found Riley's testimony to be persuasive, an in-depth discussion of the three weaknesses he identified in NES's case is warranted.[35]

### i. Historical Gas Production

As part of his analysis, Riley reviewed information concerning the historical pro-

duction of gas from the NGP wells. Hearing Tr. II 466:22–467: 1. From this review, he concluded that the NGP wells were unable to produce a volume of gas sufficient to support the damages claimed by NES:

> The amount of gas that was required by the damage claim totaled ... 210,-679,200 decatherms of gas.... By comparison the [Columbia Natural Resources] wells when they were owned by [Columbia Natural Resources] in 1997 produced 284,500 decatherms and in 1998 they produced 342,900 decatherms, an amount far less than the amount that's included in the damage claim.

*Id.* at 467:5–12. For purposes of his analysis, Riley assumed the existence of an under-credit—recognizing that this is a major issue in dispute—and drew the following conclusion about NGP's potential gas production:

> A: Making that assumption [of an under-credit], and I know that is an issue of dispute here, but making that assumption for 2001, the gas that they believed that could have been produced by the NGP wells was 550,000 decatherms. And the amount of gas that they needed to fulfill the volumes committed to on the damage claim or alleged on the damage claim is 13,806,000. Carrying that same philosophy through the Power Point, we can see that

---

**34.** Riley is the Louis F. Tanner Distinguished Professor of Public Accounting at West Virginia University. He also practices in the area of forensic accounting. Hearing Tr. II 461:24–462:5.

**35.** Riley provided his testimony with the aid of a Power Point presentation. At the close of all the evidence, the Court asked NES's counsel if there would be an objection to the Court obtaining a copy of the Power Point slides

"not in so far as the admission of those slides as an exhibit, but simply [as a summary] to aid the Court in reviewing [Riley's] testimony...." Hearing Tr. III 134:13–16. Counsel for NES objected on the basis that he did not have an opportunity to analyze the Power Point presentation prior to the Hearing. The Court therefore did not have the benefit of Riley's Power Point slides to aid it in the post-hearing review of his testimony.

over the five-year period, NGP wells were going to produce in the, kind of the best case scenario, 2,638,600 decatherms, compared to the damage claim requirements of 211,000,000–210,679,200. And so in the damage claim only 1.25% of the total volume of gas that was required to meet the needs of the damage claim were going to be provided by the wells.

. . . .

Q: So do I understand you correctly that the amount of production measured by the decatherms from the NGP wells would provide only 1.25% of the gas needed to support the damages claimed in the Report of Economic Damages?

A: Yes, sir, that's correct. . . .

*Id.* at 468:16–469:24. Riley again emphasized these figures when he addressed the amount of revenues that NES would have been required to generate in order to support the damages claim.

Q: Will you be testifying at the trial that only 1.25% of the decatherms needed to provide this gas supply would have been provided over a five-year period by the NGP wells?

A: Yes, again, . . . the gas from NGP wells is 2,638,600 decatherms. To fulfill the damage claim you needed 210,679,200 decatherms, equal to 1.25%.

Q: Now, again just to be clear, this [ ]2,638,600 figure you've got here is giv[ing] Nicole the benefit of the under-credit that they claim, yet to the extent alleged in the Report of Economic Damages?

A: This is all the credit that they've asked for in the damage claim, that is correct.

Q: Does this mean then that 98.75% of the decatherms needed to support

the claim in the Report of Economic Damages would necessarily have come from gas purchased by Nicole from suppliers other than NGP?

A: That is correct.

Q: *Is this your opinion, and just to be clear, Nicole would have required revenues in the amount of $1,455,842,300 to generate the gross profit of [$]58, 688, 000, that's the basis of the Report of Economic Damages?*

A: *That's correct.*

*Id.* at 495:24–496:25 (emphasis added). According to Riley, "the NEM consolidated revenue for 2000 . . . was 8.6 or 8.7 million dollars[ ]"—far below the revenues necessary to support the damages claim. *Id.* at 497:7–9. The Trustee understandably questioned whether a damages claim—premised on the assumption that NES would increase the volume of gas it obtained (from NGP and other sources) by 98.75% and, even more implausibly, increase its revenues from $8.7 million to over $1.4 billion—would be supportable at trial.

### ii. Financial Stability of NES and the NES–Related Entities

Riley's testimony also raises serious doubt as to whether NES and its related entities were financially viable and could operate as going concerns in a manner sufficient to support the damage figures contained in the Damages Report. Riley conducted an extensive review of the finances of NES and its related entities based on information that included tax returns, contracts, general ledgers, books and records, a 2002 audit, as well as the deposition testimony of Fulson and others who worked for NES or other Fulson-controlled companies. *See id.* at 472:7–19. From his review, Riley determined that he

should focus on the year 1999 because that was the year that NES, NGP and NEM "came into existence or started being used as entities[,]" and because NGP acquired the gas wells from Columbia Natural Resources ("CNR") on December 1, 1999. *Id.* at 474:12–20. Working back through financial records for 1998—"because that [year] gives us a flavor of the financial health of the Nicole entities prior to this really important year of 1999[,]" *id.* at 475:22–25—Riley discovered that the companies were already losing significant amounts of money:

> Nicole Gas Marketing, at this point in time, had lost cumulatively through its lifetime, $510,800. Then we proceed to 1999 and Nicole Gas Marketing proceeded to lose an additional $414,700. So their cumulative retained earnings is around negative $925,000. Nicole Gas Production approximately broke even, they made $10,600. [NES] actually lost $112,250 for 1999.

*Id.* at 476:2–9.

Despite the accrual of sizeable losses, NGP proceeded in 1999 to purchase 143 wells (138 natural gas and 5 oil wells, *see* Damages Report at 3) from CNR. From Riley's perspective, there were a number of problems with the financing arrangement used for the acquisition—each of which significantly impacted NES's continued operations. He testified:

> Q: What did you understand to be the significant financial circumstances facing Nicole and NGP in 1999 when Mr. Fulson embarked on the effort to acquire the production of wells?
>
> A: Well, the problem was that Mr. Fulson *was unable to obtain traditional financing to obtain, to acquire,*

*obtain the wells.* If you look at it from a financial prospective, ... there is no operating history of NEM, NES or NGP prior to 1999. These are brand new companies in 1999. NGP was only marginally profitable and NES actually lost money that year. NGM had negative retained earnings of about $925,468 at 12/31/1999. And if you think about ability to pay, one of the things you focus on is current assets and current liabilities. Well, *when you subtract current liabilities from current assets, they had negative working capital* . . . .

> Q: What was the solution that emerged to the problems that Mr. Fulson had in obtaining financing for the well acquisition?
>
> A: Mr. Fulson and the Nicole companies obtained what I would describe as a bridge financing agreement with RAG PLHC.[36]

Hearing Tr. II 486:2–487:4 (emphasis added).

The terms under which NGP agreed to finance its purchase of the wells from CNR underscores the precarious nature of the Nicole entities' financial position.

> Q: Can you explain the details of how RAG and Mr. Fulson structured this bridge financing?
>
> A: Yeah, they had a loan agreement and the *loan agreement was dated March 10th, 2000.* And the Nicole companies agreed to accept loan proceeds of $1,332,800. According to the loan document or the letter of agreement that was signed, *Nicole would then repay that loan in full, on or before 12:00 noon, Monday,*

---

36. According to Riley, the acronym RAG is used interchangeably with Pennsylvania Land Holdings and its acronym, PLHC. *See id.* at 262:13–15. For consistency, the Court will use the acronym RAG throughout the remainder of this opinion.

*April 17th, 2000.* So a due date of 30, approximately 32 days after the closing of the loan agreement, they were going to make good on those proceeds. At the time of the closing, Nicole Gas Production had to convey ... the rights or the ownership rights to seven wells to RAG. The next term that was even more interesting was that in partial consideration, Nicole shall grant to RAG an exclusive option to purchase any of the wells in or on RAG lands. The purchase price of the wells shall be equal to the price paid by Nicole in the purchasing of the wells from Columbia, $10,805. In addition, the option agreement shall prohibit Nicole from drilling any new or additional wells on RAG lands. So there's an option then where any of the wells that RAG would like because they're on RAG lands that they can buy back....

And then the fourth term is that Nicole gave RAG a right of first refusal. Meaning that if any of the wells, if Nicole tried to sell any of the wells to anyone else, then RAG had a right to say we would like to buy that....

*Id.* at 487:5–488:15 (emphasis added). The option to buy back the wells applied to all 143 wells. *See id.* at 488:4–6.

Due to its almost immediate payment default on the RAG bridge loan, NGP forfeited most of the wells soon after it obtained possession of them. According to Riley, "it's not surprising with a bridge loan, 32 days to pay it back, that the due date passed and Nicole went into default on the[ ] loans." *Id.* at 488:23–25. The following time-line reflects NGP's loss of the wells.

- Upon closing of the bridge loan in March 2000, NGP conveyed 7 of the 143 wells back to RAG. *Id.* at 489:10–11.

- On June 27, 2000, RAG filed a complaint for confession of judgment against NGP seeking to recover the amount of the bridge loan plus interest and other costs. Judgment was entered on January 8, 2001 reducing the judgment amount to $1,354,709. On February 1, 2001, NGP lost an additional 7 wells to RAG through a foreclosure proceeding. *Id.* at 489:1–14.

- On February 5, 2001, RAG obtained another 43 wells from NGP through a third-party trustee in West Virginia. RAG then sold those wells to another entity. *Id.* at 489:14–18.

- On September 5, 2001, RAG regained possession of an additional 34 wells in exchange for releasing NGP and the other related entities from the loan. *Id.* at 489:18–21.

- An additional two wells located in Pennsylvania were returned or sold to another entity on November 6, 2001. *Id.* at 490:23–24.

- On December 6, 2001, RAG exercised its option and obtained 38 additional wells. *Id.* at 490:25–491:1.

As of December 31, 2002—less than two years after it purchased the wells from CNR—NGP had lost 129 of the original 143 wells and retained possession of only 12 wells. At that time, "the financial condition [of the Nicole entities] was obviously very, very bad. They only had [$]10,000 in assets, compared to $6,376,500 worth of liabilities. And as we looked at earlier, the alleged under-crediting just doesn't explain this magnitude of losses." *Id.* at 485:11–16. Thus, the less-than-favorable financing terms with RAG resulted in a rapid dissipation of NGP's production capacity due to the loss of wells following its default on the bridge loan. Given the Nicole entities' dire financial condition as

of December 31, 2002, Riley would have opined at trial that the ultimate demise of the Nicole entities was not causally linked to TCO's alleged under-crediting of NGP's gas production. He explained:

> [I]mplicitly they were expecting gas from the wells to be servicing the damage claim gas requirements. And there's an implicit assumption that Nicole would have owned those wells. *But in fact through this foreclosure process they in fact lost all of these wells and it had nothing to do with the dispute at hand here, the alleged under-crediting.*

*Id.* at 491:22–492:4 (emphasis added). Instead, according to Riley, the problems started at—or even before—the time when NGP acquired the wells. *Id.* at 492:20–21 ("And so the control was effectively lost when this deal [with RAG] was struck.").

Riley's conclusion was bolstered by the deposition testimony of Kevin Smoot ("Smoot"), who was controller for NEM beginning in May 2000. *See* Trustee Ex. 57, Smoot Dep. 6:23–8:3, Nov. 7, 2003.[37] Smoot was involved in creating and presenting financial information to potential lenders on behalf of Fulson's companies. Despite Fulson's representations that his companies were profitable, Smoot soon discovered "how commingled the statements were, [and] actually realiz[ed] the company was losing money head over heel.... [T]he company was losing at least [$] 125,-000 to [$] 150,000 a month in terms of the roughly estimated net losses on a monthly basis. So, it was a negative cash flow scenario." *Id.* at 30:1–5.[38]

Smoot questioned the financial viability of Fulson's entities and made a number of observations as to the problems Fulson faced with obtaining financing. For instance, Smoot made the assumption that Fulson created many of his companies—in addition to NEM—in order to obtain financing "because if you give Nicole Gas Marketing's audit out to any financial institution they are not going to give you a loan." *Id.* at 33:23–34:2. Although he presented financial projections to various lending institutions, Smoot stated that the companies "had projections that were made out depending on whether Fred [Fulson] was trying to acquire something or buy something, or—so there w[ere] numerous projections." *Id.* at 40:4–7. He also believed that the projections "were definitely overstated [and] ... you couldn't 100 percent rely on them." *Id.* at 41:2–6. At one point, Fulson was only able to obtain a line of credit in the amount of $25,000, even though he had requested "millions." *Id.* at 42:8–9.

The Nicole entities had a number of other financial problems that Smoot described. The companies were not paying suppliers and, soon after their creation, had difficulty obtaining trade credit. *See id.* at 45:4–47:24 (many suppliers began requiring letters of credit). Smoot was charged with helping Fulson "raise capital whether through loans or investments or what have you. I could not achieve that with the state of the company. It was just no way." *Id.* at 60:23–61:3. The companies "aggressively" pursued the refinancing of the wells with numerous lending

---

37. It is unclear when Smoot's employment with NEM ended.

38. Throughout this opinion the Court references certain statements that were made about Fulson and how he operated NES and its related entities. The Court does not make a finding as to the truth or falsity of any particular allegation, but concludes that the cumulative effect of this testimony regarding Fulson's business practices certainly was a legitimate factor for the Trustee and the Committee to take into account in assessing whether Fulson would have been an effective and credible witness in the State Court case.

institutions, *see id.* at 73:9–75:10, but the banks would not loan funds based on the lack of history: "Primarily it was just [a] lack of history. I think the entities that were started, [were] just too new. [They] [d]idn't have [a] long enough history...." *Id.* at 76:20–23.

Eventually NES was unable to buy gas and thus unable to service its contracts. *Id.* at 79:22–80:10. According to Smoot, NES "had a lot more customers than what the gas wells were producing." *Id.* at 80:9–10. But the most significant problem was apparently NES's failure to lock in its purchase price for gas prior to entering into long-term supply contracts.

> [W]hat really got [Fulson] in trouble, *most of the contracts were upside down*, meaning, which is hard to believe. I mean, to write a contract, but, you know, make a sale and then [be] forced to buy gas on a monthly basis, didn't lock up gas for a year, and gas prices went up.
>
> *You were actually selling gas to customers at a lower price than we were buying it.* Which, you know, negative gross margin before you even get the operating expenses....

[T]he basic first year accounting student could see that you don't operate a business that way.

> But, that was the situation that occurred. We were negative for the most part. *The large contracts, the amount that we were selling it for, selling to customers, was less than what we were buying gas for.*

Q: Is that because Nicole didn't have the control over the price of gas you were buying?

A: Right, right. Didn't have, like I say, didn't have—*didn't lock in long term sources of gas before marketing it. And on the gas prices side, you had customers that had a fixed price for a year, and buying gas on a monthly basis. Bang, just (indicating) ended up, like I say, negative gross margin off the bat.*

*Id.* at 83:13–84:18 (emphasis added).

### iii. *Business Plan v. Damages Claimed*

Finally, Riley discussed his comparison of NES's business plan and projections beginning in 1999 with its actual financial track record. *See* Hearing Tr. II 493:4–9.

Q: Did those business plans provide you with any information useful to your opinions on the facts and circumstances that actually existed for the lifespan o[f] Nicole in contrast to the assertions or assumptions in the Report of Economic Damages?

A: Yes, if you look at the 1999 NES business plan, the projections for revenues for 2000 I believe were $12,000,000. In order to fulfill and that was for, yeah, for revenues. In order to fulfill the damage claim you needed $75,000,000 worth of revenue. So they would have had to jump from a plan of [$] 12,000,-000 all the way to [$]75,000,000 a year later. Which is really just a massive leap. But even more telling, if you look on one of the last pages of the business plan, they had a projection for 2001. There they had $19,000,000 worth of revenue projected compared to the Selby/Bodamer damage claim of [$]75,-000,000. And even more telling, the projected income for that year was a loss of 164 or $168,000 compared to the Selby/Bodamer damage claim which has a gain of $2,000,000. So we've got a reversal, a complete reversal of what their plan was a few years later.

Q: *So in your opinion does the Report of Economic Damages describe a different set of facts and circumstances in comparison to those which in your opinion actually existed given Nicole's historical performance and condition?*

A: *Yes, sir, it does.*

. . . .

Q: *Then is it your conclusion and would it be your testimony at the [S]tate [C]ourt case trial that the Report of Economic Damages essentially rewrites the history of the Nicole entities?*

A: *Yea, my opinion would be that the Selby/Bodamer damage report describes a set of facts and circumstances that simply didn't exist. It ignores the financial condition of the companies. It ignores their business model where they were selling gas at a price that was lower than they were buying it for. It assumes that the NGP, implicitly it assumes that the NGP gas production is going to be more than adequate than supply. In fact it's only 1.25% and it assumes that they would have— that Nicole companies would have maintained possession of the wells, when in fact they didn't through the RAG financing agreement. So effectively it ignores those four attributes of what was really going on at the companies. So, again, it's based on a set of facts and circumstances that just didn't exist.*

*Id.* at 493:10–495:23 (emphasis added). Riley ultimately concluded that there is no causal connection between TCO's alleged under-crediting of NGP's gas production and the $36 million damage figure arrived at by Selby and Bodamer.

A: Essentially, again, I'll go back to a set of facts and circumstances that didn't exist, it [the Damages Report] ignores the financial condition of the business. It ignores how they'd been operating the business historically. It ignores the fact that the gas production is not even close to sufficient to supply the needs of the damage claim. It ignores the ownership issue of the RAG, related to the RAG financing.

Q: So in a word is it your testimony that there is no causal connection between the claimed lost profits and the alleged under-crediting?

A: That's correct.

*Id.* at 497:17–498:4.

The Court finds Riley's testimony highly credible and persuasive with respect to the weaknesses in NES's case before the State Court.

### b. The Speculative Nature of the Damages Claimed in the State Court Case

 The main portion of the damages claim—totaling approximately $42 million—is attributed to losses for "future profits from hypothetical future business." Hearing Tr. I 119:6–7. In Ohio, a plaintiff may recover lost profits on a breach-of-contract claim if the " '(1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty.' " *AGF, Inc. v. Great Lakes Heat Treating Co.*, 51 Ohio St.3d 177, 555 N.E.2d 634, 638 (1990) (quoting *Charles R. Combs Trucking, Inc. v. Int'l Harvester Co.*, 12 Ohio St.3d 241, 466 N.E.2d 883, 885 (syllabus ¶ 2) (Ohio 1984)); *see also Telxon Corp. v. Smart Media of Delaware, Inc.*, 2005 WL 2292800 at *37 (Ohio Ct.App. Sept. 21, 2005)

(same). The party seeking to recover damages for lost profits also must demonstrate the amount and existence of the lost profits "with reasonable certainty." *AGF, Inc.*, 555 N.E.2d at 638. Meeting this standard becomes more difficult when a relatively new business seeks to recover damages for lost profits.

> [I]f the business is a new one or if it is a speculative one that is subject to great fluctuations in volume, costs or prices, proof will be more difficult. Nevertheless, damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.

*Id.* (emphasis omitted) (quoting Restatement (Second) of Contracts § 352, cmt. b (1981)). See also *Telxon*, 2005 WL 2292800 at *43 ("Evidence of lost profits from a *new business venture receive[s] greater scrutiny* because there is no track record upon which to base an estimate." (internal quotation marks omitted)). Both the reasonable-certainty standard and the three-part test enunciated in *Combs Trucking* apply to a new business seeking to establish lost profits. *AGF, Inc.*, 555 N.E.2d at 639.

The damages NES allegedly sustained— for "future profits from future hypothetical business"—are obviously remote and speculative. Thus, NES would bear the burden at trial of proving "the existence and amount of lost profits ... with reasonable certainty." *Telxon*, 2005 WL 2292800 at *43. The Court must evaluate what impact the speculative nature of the lost "future profits from future hypothetical business" may have on the probability that NES would succeed at trial.

In support of its motion for summary judgment on the lost-profits issue filed in the State Court case, TCO refers to Bo-damer's deposition testimony, arguing that the "claim for lost future profits is based almost entirely upon assumptions, speculation and 'the entrepreneur's cheerful prognostications[, which] are not enough' to support such a claim." Trustee Ex. 25 at 14 (quoting *Schonfeld v. Hilliard*, 218 F.3d 164, 173 (2d Cir.2000)). Accordingly to TCO, Bodamer's deposition testimony reflects that her damages opinion was not predicated upon a thorough analysis of NES's actual operating results and financial condition. Indeed, as TCO points out in the summary judgment motion, it appears that Bodamer did little more than review existing contracts and discuss with Fulson his plans for the future of NES. The following is an exchange between TCO's attorney and Bodamer:

Q: So you wanted to look at all existing contracts in effect for December of 2000, January of 2001?

A: All existing contracts that his business had.

Q: Was that the extent of your review or research of Mr. Fulson's existing business?

A: I took a look at all of his suppliers, where his supply was coming from, his company production, how he was going to serve those customers.

Q: In other words, where the supply would come from to go and fulfill the existing contracts?

A: The existing contracts.

Q: *Did you review anything else with respect to Mr. Fulson's existing business?*

A: *I interviewed Fred at length for his existing business, for his future plans, for his marketing strategies, for his employees, both, you know, current and what he had projected into the future.*

*Id.* at Ex. B, Bodamer Dep. 44:11–45:7, Aug. 1, 2006 (emphasis added). To formulate the Damages Report, Bodamer and Fulson in essence developed a business plan for NES. Bodamer testified in her deposition as follows:

A: I spoke with [Fulson] at length on that particular visit [in May or June of 2005], but we had a lot of communication, and it was as I—I first interviewed him and sort of got the viewpoint of what his marketing plan and strategies would be.

As we went forth to develop the business plan, I called him on a regular basis as I went through the different aspects and asked questions.

*We modeled a business plan based on Fred's marketing plan.* It was not based on what I thought his marketing plan should be, *it was based on what Fred had planned to do.*

*Id.* at 46:12–24 (emphasis added). *See Schonfeld,* 218 F.3d at 174 (projections based on business plan were legally insufficient to support damages claim). Her review was limited in scope and she did not review the financial condition of NES as it existed early in 2000—the year prior to the Damages Period.

Q: You didn't review to look at the financial condition of the Nicole entities in March or April of 2000?[39]

Q: Did you?

A: No.

Q: Let me make sure I understand. At the time of March/April of 2000, you did not review documents, data, financial or otherwise, and don't have an opinion as to the financial status of NES, other than you would have assumed it would have been an ongoing concern?

A: *I did not, okay, review his financial situation.*

Q: You have no idea what the actual financial condition of Nicole Energy Services was in March or April of 2000?

A: Other than taking a look at the debt that has been provided.

Trustee Ex. 25, Bodamer Dep. 148:15–149:11 (emphasis added).

TCO also filed a separate motion for summary judgment in the State Court, arguing that NES could not support its damage claim because there was no enforceable contract between NGP and NES for the purchase of gas at the rate set forth in the Damages Report. According to TCO, Bodamer's analysis was based on an unenforceable contract—and little else except for Fulson's future plans, which were not grounded in financial reality.

Bodamer testified that when she performed her calculations as to the amount of damages NES allegedly suffered as a result of Columbia Gas's breach, she relied on the Base Contract. She had never seen any invoices or bills that would evidence individual sales of gas. Indeed, her deposition makes clear that she relied solely on the Base Contract, the Transaction Confirmations, and Mr. Fulson's explanations of those documents as the basis for her determination as to an amount of damages.

Trustee Ex. 26 at 9 (citations omitted). Bodamer stated that she did not review "any invoices ... any bills, [or] anything that evidence the sale of gas from NGP to NES[.]" Trustee Ex. 26, Bodamer Dep. 94:24–95:4, Aug. 1, 2006. Bodamer's testimony also raised questions concerning the validity of the price NGP charged—or would have charged—NES per decatherm

---

39. Sanders interposed an objection to this question, but did not state the basis for his objection. Trustee Ex. 25, Bodamer Dep. 148:19.

of gas. *See generally id.* at 88:1–101:9; 104:5–109:18. When asked about the impact of the price per decatherm at $2.85 as opposed to $3.75, Bodamer conceded that the higher price would affect profitability. "Q: If you chose ... $3.75 as the operative price here, isn't it true that that would leave NES with less profit because they would be paying more, presumably, for their gas from their affiliate? A: Yes." *Id.* at 97:1–6.

In the Court's view, these statements in particular highlight the speculative and remote nature of NES's claim for alleged lost profits. Bodamer's testimony, in fact, raises serious questions as to whether NES could sustain its damages claim. *See MindGames, Inc. v. W. Publ'g Co.,* 218 F.3d 652, 658 (7th Cir.2000) ("Damages must be proved, and not just dreamed...."); *Schonfeld,* 218 F.3d at 172 ("Projections of future profits based upon a multitude of assumptions that require speculation and conjecture and few known factors do not provide the requisite certainty." (internal quotation marks omitted)); *Benham v. World Airways, Inc.,* 432 F.2d 359, 360 (9th Cir.1970) ("[T]o sustain a claim for [future] profits, facts must exist and be shown by the evidence which afford a basis for measuring the plaintiff's loss with reasonable certainty. The damages must be susceptible of ascertainment in some manner other than by mere speculation, conjecture, or surmise ...." (internal quotation marks omitted)). Without more—such as a review of NES's financial status and a comparison of it's business with others in the gas industry, for example—the Court concludes that NES likely would have significant difficulty establishing the lost profits portion of its damages claim. *See Piscitelli v. Chemstreams, Inc.,* 1993 WL 21015 at *2 (Ohio Ct.App. Jan. 27, 1993) (Plaintiff failed to establish lost profits with reasonable certainty when they "offered no true expert testimony, little economic data, no market surveys or analyses and no business records of similar enterprises [and] [i]nstead, ... offered only the testimony of [persons who were not] qualified to forecast profits, and financial documents which failed to demonstrate that Chemstreams was even a profitable enterprise."). Thus, in considering the probability that NES would succeed on the merits at trial, the Court finds the speculative nature of the purported damages for lost profits to be a factor weighing heavily in favor of approval of the compromise.

### c. Sanders's Testimony Regarding His Evaluation of the Merits of the State Court Case

As special counsel hired by the Trustee to conduct the State Court litigation on behalf of the estate, Sanders testified as to the likelihood of NES's success at trial. Having reviewed his testimony and considered his demeanor, the Court concludes that Sanders did not convincingly make the case that NES would likely succeed in the State Court litigation. Rather, Sanders offered many sweeping and optimistic conclusions that have little, if any, support in the record or in the law. For example, counsel for the Trustee asked Sanders whether TCO "sought to exclude ... Mr. Sly's [NES's gas measurement expert] testimony." Hearing Tr. I 223:9–10. Sanders simply replied by saying "[n]o chance in heaven to do that." *Id.* at 223:11. And when he was questioned about how a jury would evaluate the case, Sanders provided an equally conclusory statement:

Q: How do you accurately predict what a jury is going to do?

A: Juries don't like utility companies.

Q: So you believe the jury's prejudice against the defendant would be a factor. And what would the affect be on the outcome of the trial?

A: Oh, I just think people are human and when they look at a big utility company that doesn't—you see the problem here for Columbia Gas is that not only did they not measure the gas correctly, for almost two years they gave Nicole Energy Services no credit on the unmetered wells. Zero. So when I have facts like that and I can stand before a jury of ordinary people and say you've got this big corporation that gave this man no credit, zero, for two years, then I think I get a jury verdict.

Q: But is there any way that you can guarantee what that jury verdict is going to be?

A: I've got an old fedora at home and I'll eat it if I don't get a jury verdict.

*Id.* at 225:7–25. While observing that "one can speculate t[il] the cows come home as to what a jury would find[,]" Sanders offered his unequivocal opinion that the trial of NES's claims in State Court would result in nothing less than a complete victory. Hearing Tr. II 315:14–16. Yet it is important to bear in mind—as the Trustee no doubt did in opting to accept the settlement—that Sanders has little or no "first-chair" jury trial experience and limited familiarity with jury decisions in Franklin County, Ohio:

Q: Do you know whether a common pleas court jury in Franklin County has ever awarded a verdict in a business case of $36,000,000?

A: I'm told there are tort verdicts above that level and this I view as a business tort.

Q: Do you know what the highest reported jury verdict in a business breach of contract case is here in the last 10 years?

A: No, I do not know.

Q: Have you ever been counsel, lead counsel, in a case tried to a jury where a jury awarded $36,000,000?

A: No, I've second chaired some cases but I've never—actually, in purposes of full disclosure, I've never had to in my career be a lead trial counsel. My cases either settle or I win them on a motion.

Q: *So if I ask you what the highest verdict that you'd ever won in a jury trial that you conducted, the answer would be zero?*

A: *As second chair it would be $600,000.*

*Id.* at 310:1–21 (emphasis added).

Sanders accepted the Damages Report and the underlying bases for the damages claimed without reservation.

A: I had of course formulated an opinion as to what I believed the value of the case was.

Q: And what was that value?

A: I accepted what Ms. Bodamer and Mr. Selby had concluded. One of the rules in my book of litigation at least is to get very competent experts who are not just academics but who are really well versed in their particular field through practical experience. I got such experts in Ms. Bodamer and Mr. Selby.... I studied that [Damages Report] closely and I believe it is a very objective and sound evaluation of the claim.... I agree with what my experts have provided.

Q: At that point in time did you have any reason to question, to impugn or to devalue what your experts have provided?

A: No, no, I questioned Ms. Bodamer closely and she had very responsi-

ble cogent explanations for her conclusions.

*Id.* at 240:14–241:24. He did not, however, seem willing even to consider TCO's arguments in evaluating the overall merits of NES's case. "Q: Do you disagree with anything in [Dr. Riley's] deposition? A: Almost all of it." *Id.* at 260:2–4. Sanders also exhibited a significant level of personal hostility toward TCO, stating his belief that TCO's executives "perjured themselves repeatedly[,]" *id.* at 286:4–5, and adding that he was aware of various actions against TCO including "government enforcement activity[,] investigations [of] ... kickback payments [and] all sorts of ugly stuff." *Id.* at 286:13–16. He testified that, in his opinion, TCO is "a corrupt company" and that he has "no respect for its officers." *Id.* at 286:18–19. These statements (among others) leave the Court with the impression that Sanders lacks the level of emotional detachment necessary to provide a clear-eyed, dispassionate assessment of the strengths and weaknesses of NES's case against TCO and, ultimately, its probable success at trial.

The Court recognizes that Sanders has the duty to zealously represent NES in the State Court litigation. There is no question that he has ably discharged this duty. Nor is there any doubt that Sanders is very familiar with all aspects of the case and is well-prepared for trial. But having considered Sanders's testimony in light of all the evidence presented, the Court is simply not persuaded that the Trustee's assessment of the probability of NES's success at trial was anything other than fair and sound.

In the end, the Trustee made a very thorough and detailed presentation concerning his analysis of the strengths and weaknesses of NES's case. Most prominent among the weaknesses identified by the Trustee are the questionable assump-

tions underlying the Damages Report. Also quite problematic is NGP's rapid loss of the wells it acquired from CNR—following its default under the bridge financing arrangement with RAG. This loss of production capacity would have severely hindered NES's ability to establish a causal connection between the alleged damages it sustained and the purported under-crediting by TCO. None of the Objecting Parties made any attempt to explain how NES's operations could have supported the damages claim without these wells. Moreover, the testimony of Riley (at the Hearing) and Smoot (by deposition)—which the Court finds very credible—raises fundamental questions concerning the financial viability of NES and its related entities. It simply strains credulity beyond the breaking point to assume, as Bodamer did, that a company with little or no operating capital—and a rather dismal financial track record—would have generated revenue at the levels necessary to support a $36 million damage claim. Finally, Sanders's admitted lack of jury experience as well as his sweeping, rosy pronouncements about the likelihood of success at trial understandably raised serious questions in the Trustee's mind about whether NES would in fact achieve the success that Sanders predicted. At bottom, the Trustee concluded that rejecting the proposed settlement and proceeding to trial would pose an unacceptable risk to the creditors of NES's estate—an assessment shared by the Committee. The Court agrees. *See Haven,* 2005 WL 927666 at *4 (approving compromise because "risk that [defendant] would prevail in the adversary proceeding does indicate the prudence of a compromise").

Finally, the Objecting Parties offered no credible evidence to challenge the soundness of the Trustee's assessment and persuade the Court that NES has a reason-

able likelihood of success at trial. And in the absence of any proof by the Objecting Parties demonstrating that the Trustee's judgment as to the probability of NES's success at trial was flawed, the Court has no basis to question his decision to settle the State Court case. *See Tri–State Ethanol,* 370 B.R. at 229 (finding limited probability of success in absence of showing that "the trustee's assessment of the estate's probability of success ... was flawed"). In sum, the first factor in the Court's Rule 9019 calculus—the Debtor's probability of success in the litigation—weighs heavily in favor of approving the proposed settlement.

### 2. Difficulties of Collection

The Court next must evaluate the difficulties the Trustee would face in collecting any judgment the estate might obtain against TCO. The Trustee is not concerned about the collectibility of a judgment against TCO, even if a substantial judgment were obtained. Hearing Tr. I 72:20–25. Rather, the problem with collection stems from TCO's "ability to sustain the litigation over an extended period of time." *Id.* at 73:2–3. TCO could, and likely would, frustrate the Trustee's ability to collect any judgment by pursuing its appeal rights. *See id.* at 73:6–7. The Trustee estimates that the appeal process may take as long as three years to complete. *Id.* at 74:5–8. Wright also confirmed TCO's willingness and ability to pursue the matter through the appellate process. Hearing Tr. II 436:17–437:5.[40] The anticipated appeal would "delay the process significantly and make it harder for the creditors to realize any immediate benefit from the judgment." Hearing Tr. I 73:10–11. Thus, while the Trustee has no doubt that

a judgment against TCO would be collectable, TCO's superior financial resources would ensure a lengthy appeal process and cause substantial delay.

### 3. Complexities of the Litigation, Expense and Delay

The Court also must evaluate the complexity of the State Court litigation, including the expense, inconvenience and delay that the parties would face if the case were to proceed to trial. *See Fishell,* 1995 WL 66622 at *3. There is no dispute regarding the complexity of the evidentiary and legal issues currently pending before the State Court and those that would face the court and a jury if a trial were held. According to the Trustee, the litigation involves "complex, scientific evidence ... both on gas measurement and also on the economic damages." Hearing Tr. I 75:2–4. From his perspective, the complexity of the subject matter would pose substantial risks:

> [T]he issues concerning gas measurement are beyond the understanding of the ordinary juror. Each side was planning to and will have to present expert opinion testimony. There's a high probability that most of the proceedings in the [State Court] will consist of swearing contests between the expert witnesses and attempts to discredit each other's science, if you will.

*Id.* at 75:7–13. And the dispute over the damages is very complicated "because of the nature of the damages claimed by Nicole, particularly the fact that a substantial portion of those damages are lost profits from prospective future business." *Id.* at 75:16–19. *See also* Hearing Tr. II 367:21–25 (As Donchess opined, "it's too specula-

---

**40.** Both sides expect that NES also would appeal if it did not succeed at trial. *See* Hearing Tr. I 73:6–7 (The Trustee stated "in [his] evaluation, that either side would appeal the trial results."); Hearing Tr. II 436:20–22 (According to Wright, TCO "[a]bsolutely" expects an appeal if NES were to lose at trial.).

tive ... it's a complex trial, [it] could be a long trial and there's going to be ... many issues to appeal the case on in both directions.").

Inherent in the complexities of the State Court case are expense and delay. *See Fishell*, 1995 WL 66622 at \*4 ("The fact-intensive nature of the dispute also means that any litigation would be time-consuming and expensive."). If the proposed settlement is not approved, the Trustee anticipates that the State Court may set a trial date to begin within 60 to 90 days. He estimates that the trial would take approximately two weeks. The appellate process, in his estimation, could take somewhere between two and three years. Hearing Tr. I 74:1–8. In the Trustee's opinion, "the longer the matter continues the greater the loss of evidence, memories fade, etc. It makes the litigation more difficult." *Id.* at 74:17–19. *See also* Hearing Tr. II 436:9–13 (Wright testified that he expects a two to three-week trial and stated that when the case was originally remanded, "it was approximately six months to about a year before we were able to get a trial date.").

Undoubtedly, the State Court case is highly complex and would present many factual and technical issues for a jury to consider. The parties would incur significant expense in moving forward with a trial and inevitable appeals, and clearly a distribution to unsecured creditors would be further delayed. For these reasons, the Court finds that the complex nature of the litigation, as well as the expense and delay involved, also weigh heavily in favor of approving the settlement. *See Bard*, 49 Fed.Appx. at 532 ("[T]he court's recogni-

tion of the expense, inconvenience, and delay inherent in any trial of the employment dispute ... supports the ultimate conclusion of the bankruptcy judge to grant the motion to accept the compromise."); *Carson*, 82 B.R. at 854 (The third prong of the Rule 9019 settlement test weighed heavily in favor of compromise because, "the estate [would] be required to bear the burden of an expensive, protracted and complex legal proceeding.... Given the problematic nature of a possible recovery, it would certainly be unwise to 'roll the dice' at trial in the hope of gaining a higher recovery....").

**4. Interests of Creditors and Deference to Their Views**

The final factor the Court must consider in evaluating the proposed compromise under Rule 9019 is whether the settlement meets the paramount interests of creditors and whether the Trustee gave proper deference to their views. The Trustee worked with an active and experienced Committee.[41] The Trustee pointed out that many of the Committee members "were senior credit managers with significant bankruptcy experience or they were attorneys." Hearing Tr. I 79:3–5. He also noted this case is somewhat unusual because while there are a relatively small number of creditors, the claims held by these creditors are sizeable. Many Committee members' claims had been reduced to judgment as of the Petition Date. *Id.* at 78:8–22.

The Committee conducted its meetings by telephone conference, *see id.* at 80:20–22, and the Trustee prepared and circulat-

---

**41.** Although the Committee was aware that it could employ counsel to represent its interests, according to the Trustee, the Committee members realized there was no money in the estate to support attorney's fees and "were comfortable with ... [and] had experience with matters of this type and they didn't feel that counsel would add anything to the process." Hearing Tr. I 80:11–14. Thus, the Committee made the decision to act without separate counsel.

ed for review the minutes from each meeting. *See id.* at 81:2–20. The Trustee also communicated with Committee members by individual and group e-mails or by telephone communications with individual members. *Id.* at 81:21–82:2. The primary purpose of the Trustee's communications with the Committee was "[t]o seek input from the creditors as the settlement negotiations progressed and also to advise them of the status of the case." *Id.* at 82:4–5. *See also* McMichael Dep. 17:16–23 (Trustee conducted meetings "[t]o make the [C]ommittee aware of the events that had taken place in the bankruptcy ... and to seek input and agreement from the [C]ommittee on steps or plans that the [T]rustee sought to take.... Specifically and most materially, with regard to the settlement...."). As the negotiations with TCO progressed, the Trustee would prepare term sheets summarizing the negotiation points at issue and detailing each side's positions. Hearing Tr. I 82:9–16. The Trustee provided these term sheets to the Committee members "for [their] review and comment before any information on that sheet was presented to TCO's representatives." *Id.* at 82:23–83:2. *See also* Hearing Tr. II 344:10–19 (According to Donchess, the Committee members reviewed and approved the term sheets before they were submitted to TCO's counsel.).

The paramount goal expressed by the Committee on behalf of the creditor body was to maximize the value of the Assets and provide a distribution of 25% or more to holders of unsecured claims. The Committee was unwilling to settle the case for a nominal amount. *Id.* at 345:7–13. Based on the terms of the APA, the Trustee anticipates a dividend to unsecured creditors of approximately 41%. The settlement, if approved, clearly exceeds the Committee's stated goals for recovery. *See generally* Hearing Tr. II 345:14–17.

The timing of a distribution under the settlement also was an important consideration for creditors. *See id.* at 368:6–25. *See also id.* 368:13–25 ("[H]ere's a chance to at least return some money to [creditors].... [T]he timing is importan[t]. There's going to be a lot of delay if there is a trial and appeals.").

The Trustee took into consideration the various concerns and opinions that the Committee members expressed regarding whether to settle the State Court case or to proceed to trial. A number of creditors had prior litigation experience with Fulson and the NES-related entities, which, as the Trustee explained, caused "a reluctance to rely upon Mr. Fulson to any great degree to prosecute the [S]tate [C]ourt case." Hearing Tr. I 79:20–22. He added that creditors "expressed some concern about Mr. Fulson's previous business practices and a worry about proceeding with the [S]tate [C]ourt litigation under those circumstances." *Id.* at 83:15–17. Regarding the concerns he and others held about Fulson, Donchess remarked as follows:

[T]he impression that we and others had gained was that the Nicole entities were being operated in, you know, in a fashion that wasn't completely upfront and we were all concerned that if the principal of these entities were ever required to testify on behalf of [NES] in this case against the Columbia [E]ntities, that if all of these practices, the shifting of money, the separate corporations, all of the avoidance of debt, all of those practices came into the case or anything else ... that the jury would somehow get the sense that [it] might not like the principal of Nicole Energy, might not like the business practices. And that was a substantial litigation risk.... And if the jury got the sense that he was not totally on the up and up ... the jury might have an unfavorable view of [Fulson].

Hearing Tr. II 343:3–23. Thus, creditors believed that an unfavorable view of Fulson by a jury could potentially have a negative impact on the damages case and, as Donchess put it "[NES could] lose the whole case." *Id.* at 344:2–9.

According to the Trustee, the Committee members also questioned the viability of NES's claim for "future profits on hypothetical future business" set forth in the Damages Report and "the factual basis upon which the [Damages Report] had been predicated." Hearing Tr. I 83:11–14. *See also* McMichael Dep. 21:10–13 ("The report seemed to rely pretty heavily on the reports of others and seemed to be pretty liberal in their expectation of future business by [NES]...."). After reviewing the Damages Report, Donchess concluded that NES would have difficulty establishing at trial a number of the assumptions underlying the report. For example, 90% of the alleged damages were premised on an assumption that NES would obtain additional customers or that NES would qualify for minority-owned business programs with governmental agencies. Hearing Tr. II 359:1–25. Donchess, however, stated that NES "was not the minority entity that was selling to governments[,]" but rather NGP was the minority entity that held the government contracts. *Id.* at 359:19–21. Thus, any new minority-owned business customers would not be customers of NES. *Id.* at 359:22–25. And, although he did not totally discount the Damages Report, Donchess recognized the possibility that NES would lose on the "softer, more speculative damages" attributable to the loss of potential new customers. *Id.* at 386:23–387:5.

Donchess also questioned whether NES had the infrastructure in place to obtain new customers and stated his belief that NES may have been barred from obtaining federal government contracts.[42] *Id.* at 360:1–25. He considered the potential battle of the experts that would ensue if the case proceeded to trial. *Id.* at 363:3–10. Based on all these factors, among others, Donchess was concerned that a "jury might not accept the damage picture and we could get either zero or less than the settlement [amount][,]" *id.* at 362:22–23, and the State Court case "could be lost."[43] Hearing Tr. II 362:8–9. Most telling about the Committee's thinking in evaluating the proposed settlement is the following statement by Donchess on cross-examination by counsel for NES:

> You asked me [if] a $5,000,000 settlement would have been okay. If Mr. Fulson had come in and offered $5,000,000 for the claim, the committee—I mean I would have definitely supported the sale of it because we would have gotten more money out [of it]. But we didn't get that.... [N]o one came forward with any more money. No one else in the industry. Not Mr. Fulson, none of his companies and no one else. So in a way we tested the value. If anybody thought it was worth more and wanted to put their own money on the line, I mean *what you really want us to do in challenging this [sale/settlement],*

---

42. The concerns raised by Donchess were based on a judgment-debtor examination of Fulson and NES that was conducted on behalf of the AGF Direct Gas estate. *Id.* at 361:3–23.

43. The Committee made the decision to forego questioning Sanders about his views of the State Court case. According to Donchess, the Committee "knew that Mr. Sanders was optimistic about the case and believed in the case. So we didn't really feel we needed to ... get his input because we thought we knew what he would say[.]" *Id.* at 366:5–8. McMichael viewed Sanders's "opinion to be pretty biased.... That he would be inclined to fight. I don't think settlement was in his plans." McMichael Dep. 136:12–16.

*is to gamble with our own money. If Mr. Fulson ... wants to try to recover more than $3, 000, 000 or more than $4,000, 000 so that he can have money over and above it, but what he's—but he's not gambling with his own money because ... it's the creditors' $3, 000, 000 and we, you know, have our money on the line [and] think that's a fair deal. Mr. Fulson wants to gamble with our money.*

*Id.* at 403:1–23 (emphasis added).

In his deposition, McMichael echoed many of the concerns expressed by Donchess. *See* McMichael Dep. 81:3–8 ("[W]here I think there's quite a bit of risk in th[e] [Damages Report] is the extrapolation of the business and the growth of the business ... as well as just the fact that the dispute is really about 500,000 de[c]atherms and the value of that gas at some point in time."); *id.* at 120:22–121:3 ("I believe that if Columbia is required to pay any material amount of money, that they will appeal that judgment; that if they are forced to pay, that that payment will be accrued by the estate and will not be allowed to be distributed to the creditors in any way, shape, or form; and that the litigation will continue for an indefinite period of time."); *id.* at 121:19–24 ("[C]ommittee members are seeking to quickly resolve this case and to minimize further expenses and to bring the matter to a close and to get whatever recovery they are going to get paid as quickly as possible. *We're not here to try to, you know, bet the house and win the farm.*" (emphasis added)).

The Trustee received unanimous support from the Committee members for the settlement with TCO. Hearing Tr. I 85:10–24 (Committee members expressed their support during a conference call conducted by the Trustee on October 12, 2007 or by e-mail.). In the Trustee's opinion, the

Committee overwhelmingly supported the settlement for a number of reasons:

Many of [the Committee members] had been waiting for many years to get a dividend on their claims against Nicole. A number of them had had what I perceived to be unhappy litigation experiences or, in fact, had taken a position in the involuntary bankruptcy on the litigation over the appointment of a Trustee, and there was *a fundamental unwillingness to take a risk on the outcome of the [S]tate [C]ourt case trial under those circumstances.*

*Id.* at 84:21–85:3 (emphasis added).

The Court finds that the Trustee worked closely with and sought input from the Committee members as he negotiated and formulated the terms of the settlement. Ultimately, after being informed by the Trustee of the potential risks and benefits of continuing the State Court litigation, the Committee unanimously supported the proposed settlement with TCO. Indeed, the Committee members who testified at the Hearing or by deposition were unwavering in their support of the settlement. The Trustee took into account the creditors' desire to receive a return on their claims of no less than 25%. He also gave proper deference to the Committee's views regarding the viability of the State Court case and the perception a jury may have concerning the operations of NES and its related entities. The Committee also supported the Trustee's efforts to establish competitive bidding procedures. *See supra* Part VI.A.2. The Objecting Parties failed to present any evidence or testimony to challenge the Trustee's assertion that the Committee unanimously supports the settlement. Notwithstanding the Objecting Parties' suggestion to the contrary, the evidence established that the Committee was well informed and was provided with a meaningful opportunity to participate in

the settlement process. In sum, the final element of the test for analysis of proposed settlements under Rule 9019—consideration of the interests and view of creditors—also strongly favors approval of the settlement.

### 5. The Trustee Has Met the Elements Required for Court Approval of the Proposed Compromise Under Fed. R. Bankr.P. 9019.

Based on the foregoing, the Court concludes that the proposed compromise is appropriate and should be approved. The Court agrees with the Trustee's assessment that there is only a slight probability that NES would obtain a judgment resulting in a recovery that would produce greater than the 41% return creditors will receive under the settlement. Even if NES were to obtain a judgment against TCO, the Trustee would face delay in collecting a judgment for creditors because of the anticipated appeals. The litigation would involve many legal and factual complexities—a jury would have to comprehend and analyze difficult issues in the areas of forensic accounting; business and finance; gas transmission, measurement and regulation; and damages. The jury would face a lengthy trial with many experts and volumes of exhibits. The complexities of the litigation—and the appeals process that would undoubtedly follow—would necessarily result in significant costs and delay. Finally, the Committee unanimously supports the compromise, and those members who testified expressed their firm conviction that the terms of the settlement are in the best interest of the creditors of NES's estate.

These facts have not been rebutted by persuasive evidence to the contrary. The Court finds, based on the slim evidentiary record made by the Objecting Parties, that they are unable to overcome the over-whelming evidence that the Trustee offered in support of the compromise. *See Tri–State Ethanol,* 370 B.R. at 230 (approving compromise when objecting party "did not make a meaningful record that undermined the trustee's assessment of the ... claim and related issues, largely because [it did not] focus[ ] on ... the estate's probable success should those issues be litigated"). The settlement is in the best interest of the estate and will provide creditors with a prompt and meaningful distribution on their allowed claims. *See In re Quay Corp.,* 372 B.R. 378, 382 (Bankr.N.D.Ill.2007) ("A settlement should be approved by a bankruptcy court if the settlement is in the best interest of the estate."). For these reasons, the proposed compromise is **APPROVED** under Fed. R. Bankr.P. 9019.

### C. The Sale Under § 363(b) Does Not Violate the Requirements of 11 U.S.C. § 1106(a)(5).

 NEM and NGP oppose the Sale Motion on the ground that the proposed § 363(b) sale outside the context of a Chapter 11 plan violates § 1106(a)(5). This argument has no merit. Under § 1106(a)(5), a Chapter 11 trustee must "as soon as practicable, file a plan under section 1121 of this title, *file a report of why the trustee will not file a plan,* or recommend conversion of the case to a case under chapter 7, 12, or 13 of this title or dismissal of the case[.]" 11 U.S.C. § 1106(a)(5) (emphasis added). On February 17, 2005, the Trustee filed an Interim Report (Doc. 178) and stated as follows:

**DESIRABILITY OR FEASIBILITY OF PLAN:** The Trustee in a chapter 11 case is to file a plan "as soon as practicable" or to "file a report of why the Trustee will not file a plan." 11 U.S.C. § 1106(a)(5). Because of the unliquidated and disputed nature of the Debtors' [sic] assets, Trustee has been unable to

formulate a plan of reorganization at this time. However, Trustee has concluded that conversion or dismissal of the case would not be in the best interest of the estate or its creditors. There is a substantial probability of a distribution to unsecured creditors from settlement or collection of a judgment in the State Court Case.

Interim Report ¶ 12. The Court finds that the Interim Report satisfies the Trustee's obligations under § 1106(a)(5) to file a report explaining why he did not file a plan prior to seeking approval of the APA.

▇▇▇ The Court also finds that the proposed sale is appropriate even though it is being conducted outside a plan. "While we recognize the tension which exists between § 363, which requires only court approval to sell an asset, and the disclosure and voting rights found in Chapter 11, we find nothing and have been directed to nothing in the [Bankruptcy] Code which so limits the Debtors' right to seek approval for the disposition of a major asset." *In re Baldwin United Corp.,* 43 B.R. 888, 905 (Bankr.S.D.Ohio 1984). Outside of the context of a Chapter 11 plan, "a bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action." *Stephens Indus.,* 789 F.2d at 390. Moreover, "when an objector to a proposed transaction under § 363(b) claims that it is being denied certain protection because approval is sought pursuant to § 363(b) instead of as a part of a reorganization plan, the objector must specify exactly what protection is being denied." *In re Weatherly Frozen Food Group, Inc.,* 149 B.R. 480, 484 (Bankr. N.D.Ohio 1992) (quoting *Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.),* 780 F.2d 1223, 1228 (5th Cir.1986)). NEM and NGP have not specified what, if any, protections are denied by selling the Assets outside the context of a plan of reorganization. Accordingly, this argument against approval of the sale and compromise is not well-taken.

**D. The Restraint–of–Trade Argument is Meritless.**

▇▇▇ NEM and NGP also argue that the Sale Motion should be denied because the APA "is potentially an agreement or combination in restraint of trade[,]" NEM/NGP Objection at 4, and thus violates federal antitrust law. After reciting the elements of a cause of action under the antitrust laws, these parties state that the APA "exposes the estate to the potential of antitrust litigation by ... [p]ossibly every competitor of Columbia who could show damages by virtue of the agreement...." *Id.* at 6. NGP correctly states the elements of an antitrust cause of action for restraint of trade:

> Section 1 of the Sherman Act ... states, in relevant part: "Every contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States, ... is declared to be illegal." 15 U.S.C. § 1. As we have elaborated,
>
>> to establish a claim under section 1, the plaintiff must establish that the defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy were illegal and that the plaintiff was injured as a proximate result of that conspiracy.

*Expert Masonry, Inc. v. Boone County,* 440 F.3d 336, 341–42 (6th Cir.2006) (quot-

ing *Crane & Shovel Sales Corp. v. Bucyrus–Erie Co.*, 854 F.2d 802, 805 (6th Cir. 1988)). NGP, however, has not presented any evidence to show that the settlement would produce "adverse, anticompetitive effects within relevant product and geographic markets," or even what those relevant geographic markets are. It also has not shown that "the objects of and conduct pursuant to [the settlement] were illegal" or that anyone, let alone NGP, "was injured as a proximate result" of the settlement.

 Moreover, NEM and NGP failed to file proposed findings of fact to support their restraint-of-trade argument. Given the failure of NEM, NGP or any other party to present any evidence bolstering the restraint-of-trade argument, the Court must reject it out of hand. "[T]he debtor carries the burden of demonstrating that a use, sale or lease will assist the debtor's reorganization, *however, an objectant [to a § 363(b) motion] is required to produce some evidence supporting its objections.*" *In re EaglePicher Holdings, Inc.*, 2005 WL 4030132 at *1 (Bankr.S.D.Ohio Aug.26, 2005) (emphasis added) (internal quotation marks omitted); *see also Official Comm. of Unsecured Creditors of Enron Corp. v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 28 (S.D.N.Y.2005); *Telesphere Commc'ns*, 179 B.R. at 552. Because it is utterly devoid of merit, the restraint-of-trade argument asserted by NEM and NGP provides no

basis on which the Court would decline to approve the APA.

**E. The Court May Approve the Sale and Compromise Even Though It Does Not Provide a Benefit to NES, Fulson and the NES–Related Entities.**

 Two of the Objecting Parties argue that the sale and compromise does not benefit NES, NEM or other parties in interest. *See* NES Objection at 1 ("Such a proposal is not in the best interest of any parties to this case...."); Fulson Objection at 11 ("This is not a reasonable settlement to parties in interest neither the debtor.").[44] The Objecting Parties, however, fail to cite any authority that would require the Court to put the interests of the Debtor, its affiliates or equity holders above the interests of creditors.[45] As the Sixth Circuit has held:

> The trustee is empowered to compromise causes of action belonging to the bankruptcy estate. While the trustee must give consideration to the debtors' interest in any surplus remaining after the payment of all debts, fees, and administrative expenses, see 11 U.S.C. § 726(a)(6), he must also protect the interests of unsecured creditors. Fully litigating a tort claim could easily exhaust assets that would otherwise go to creditors, and in the first instance the person vested with responsibility for de-

---

44. This objection was also raised in the NEM Special Objection, which the Court previously overruled. *See supra* Part IV.B.4.

45. Equity holders have standing to oppose a proposed settlement only if they show "a real possibility that a successful objection to the motion to compromise would have resulted in a surplus." *Yates v. Forker (In re Patriot Co.)*, 303 B.R. 811, 815 (8th Cir. BAP 2004). Because NES's probability of success at trial

and, hence, the probability of a surplus for equity holders, was an issue to be determined at the Hearing, the Court permitted Fulson and the NES affiliates to appear and be heard. But, as detailed in this memorandum opinion, the Court finds that the likelihood of a recovery by the Debtor in an amount that would produce a surplus for equity holders is exceedingly remote.

ciding whether to settle or fight is the trustee, not the debtor.

*Bauer,* 859 F.2d at 441.

The Court has considered the interests of the Debtor, but concludes that the compromise has little effect on NES since this is a liquidating Chapter 11 case and the Debtor ceased operating well before the Petition Date. *See Bard,* 49 Fed.Appx. at 532–33 (upholding approval of compromise where bankruptcy court considered interest of debtors, although with "less weight than the other factors"). Fulson, NEM and the other NES-related entities each had the opportunity to submit a bid for the purchase of the Assets. They opted not to bid. Their interests were protected by the sale process and, in any event, do not take precedence over the interests of NES's unsecured creditors. *See Tri–State Ethanol,* 370 B.R. at 229 ("If the settlement is reasonable, the debtor's approval of it is not needed, and the settlement does not have to benefit the debtor.").

Accordingly, the objection asserted by NES and NEM must be overruled. *See Carson,* 82 B.R. at 852 ("While the Court may consider the objection of a creditor, or other party-in-interest, to the proposed compromise, *such an objection is not controlling and will not prevent approval by the Court.*" (emphasis added)).

### VII. Conclusion

For the foregoing reasons, the Court finds that: (1) there is a sound business reason for the sale, and its approval is in the best interest of NES's estate and creditors; and (2) the compromise is fair and equitable. Therefore, the Sale Motion is **GRANTED** and the compromise, as outlined therein, is **APPROVED** under Fed. R. Bankr.P. 9019. The objections to the Sale Motion asserted by NEM and NGP (Doc. 290); NEM's special counsel (Doc. 291); Fulson (Doc. 293); and NES (Doc. 296) are **OVERRULED.** Counsel for the Trustee shall submit a separate order in accordance with this memorandum opinion.

**IT IS SO ORDERED.**